**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Pamela Sue HURD, Defendant-Appellant.**

**No. 13032.**

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 4, 1983.

Motion for Rehearing or Transfer
Denied Aug. 22, 1983.

Application to Transfer Denied
Oct. 18, 1983.

Debra J. Hans, Asst. Public Defender, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

A jury has found defendant Pamela Sue Hurd guilty of disposing of stolen property having a value of more than $150, as defined and denounced by § 570.080.3, RSMo 1978.[1] Her punishment was assessed at imprisonment for a term of four years, as authorized by former § 558.011.1(3). She appeals.

Having had a verdict, the State is entitled to the most favorable view of the evidence and all reasonable inferences to be drawn therefrom, and to have this court disregard defendant's evidence except as it supports the verdict. *State v. Jones,* 594 S.W.2d 932, 934–935[1][2] (Mo.1980). The point of sufficiency is not specifically

---

1. References to statutes and rules are to RSMo 1978 and Missouri Rules of Court (13th ed. 1982), unless otherwise specifically noted.

raised, but in light of the ruling in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), it will be noticed briefly sua sponte. Preliminarily, we note that Instruction No. 5, the verdict-director, properly advised the jury of defendant's accessorial liability as an active aider.

The State had evidence showing that on July 15, 1981, the residence of one Forest Lynn Fisher was burglarized. Mr. Fisher, who lived at Morrisville in Polk County, testified that eleven firearms were taken. We are particularly concerned with three of these "guns": 1) a model 31 Smith and Wesson .32 caliber revolver with a three-inch barrel; 2) a .357 Colt Magnum revolver with a six-inch barrel, and 3) a Spanish-made AYA Matador sixteen-gauge double-barrelled shotgun, modified so as to fire a "tight" pattern from one barrel and a broader pattern from the other. Mr. Fisher testified that the value of these three firearms was about $875. The record does not indicate who stole the "guns."

Rodney Burk was an undercover officer employed by the Springfield Police Department. On July 19 he met the defendant on the parking lot at a south side bar. Della Campbell, an informant, introduced Burk to the defendant; thereafter Burk and the defendant conversed for about thirty minutes. Burk told the defendant he was interested in buying some stolen guns. Defendant advised Burk that she was "cool," a "burglar and a thief," and "could get whatever [Burk wanted]."

The following day, the informant called officer Burk and the defendant "came on the line." Mrs. Hurd said she had some "guns" for sale, specifically one shotgun, two pistols and two .22 caliber rifles. She offered to sell the whole lot for $350. Burk thereafter made another call to ask the defendant if she had the firearms in possession; defendant did not, but asked Burk to come to an address in northwest Springfield. Burk specifically told the defendant he "didn't want to deal with stolen goods in front of any strange people"; defendant replied "it would be cool," because "Bob" would bring the firearms and leave them in an automobile, and defendant and Burk could ride down the road while Burk inspected the firearms.

Burk did as he was told, found a residence at the designated address, and entered the house at defendant's invitation. He was introduced to an "older male" whom defendant called "Bob." The record shows that "Bob" was in fact George Robert Swett, who had pled guilty to receiving stolen property as a participant in this offense. Burk's testimony was that Bob brought the "guns" to the north side residence, explaining that he had brought only three firearms, rather than five.

Burk inspected the two pistols and the shotgun we have described. Defendant had offered to sell the pistols and the shotgun for $350, representing that the Colt .357 alone was worth $400. Burk offered $250 for the lot. Defendant indicated it would be necessary for her to obtain permission to sell the firearms at that price and placed a phone call.

At this point, Burk either asked "Bob" or "Bob" volunteered, in the defendant's presence, something further about the "guns." According to Burk, "Bob said that the guns weren't too hot [—] they'd been taken around Marshfield in a burglary."

The defendant received permission to sell the firearms for $250; thereupon, the sale was consummated. Mrs. Hurd gave part of the money to "Bob" and retained part as her commission. Upon trial, Mr. Fisher identified the three firearms sold by the defendant as being part of the lot stolen from his residence on July 15.

■ Section 570.080, "receiving stolen property," obviously denounces several offenses disjunctively but in this case, it was incumbent upon the State to present evidence showing beyond a reasonable doubt: 1) that the property was in fact stolen; 2) that the defendant exercised dominion over the property by disposing of it; 3) that defendant knew or believed the property had been stolen, and 4) that the defendant intended to deprive the owner of a lawful interest in the property. See MAI–CR.2d

24.10, outlining the elements of the State's case.

■ The sufficiency of the evidence to establish elements one, two and four is beyond cavil; the troublesome problem in any case of this kind is whether the mens rea or "culpability" element has been established, and our sua sponte, due process review is directed to the sufficiency of the evidence bearing on that element of the offense. There are at least three general approaches to the type of culpable knowledge required; these theories are known to most lawyers, and need not be repeated here.[2] In this case, the jury was required to find that defendant "knew or believed" the firearms had been stolen. It goes almost without saying that it is often difficult to make direct and positive proof of the accused's knowledge that the goods were stolen, and this element must usually be inferred from the facts and circumstances of the case. *State v. Hicklin,* 358 Mo. 1016, 1020–21, 218 S.W.2d 564, 565 (1949); *State v. Sours,* 633 S.W.2d 255, 258 (Mo.App.1982).

■ Here, the defendant was not literally "in possession" of the recently stolen property, but "Bob's" declaration that the firearms "weren't too hot" was admissible against her as the declaration of a coperpetrator made in her presence during the commission of the crime charged. *State v. Peters,* 123 S.W.2d 34, 38 (Mo.1938); *State v. Bunch,* 333 Mo. 20, 25, 62 S.W.2d 439, 442 (1933). Otherwise, the evidentiary facts and circumstances are much similar to those considered sufficient to sustain a judgment of conviction in *Sours,* and given the fact that the State is entitled to all reasonable inferences to be drawn from the evidence, the proof is sufficient to convince any rational trier of fact, beyond a reasonable doubt, that the defendant knew or believed the firearms had been stolen.

■ The defendant has briefed several points of error. She complains that the trial court erred in receiving Burk's testimony that Swett stated the weapons "weren't too hot." Defendant maintains that this testimony was hearsay and that its admission was prejudicial, citing *State v. Jones,* 583 S.W.2d 561 (Mo.App.1979), which is inapposite. Unlike *Jones, State v. Chernick,* 280 S.W.2d 56 (Mo.1955), and *State v. Johnson,* 538 S.W.2d 73 (Mo.App.1976), Swett's statement was not the statement of a stranger to the crime, nor was Swett unavailable for cross-examination. Further, "Bob" was subpoenaed as a witness for the defendant; he did testify and was cross-examined about his declaration and was specifically interrogated concerning his statement that the firearms "weren't too hot."

We do not wish to be obscure on this point. It was the State's theory, submitted in Instruction No. 5, that Swett and the defendant either acted with a common purpose or that the defendant was an active aider in disposing of the property. The State therefore properly invoked the so-called "coconspirator" exception to the hearsay rule, which makes a statement of a coconspirator or a coparticipant admissible against the defendant. Such evidence is hearsay, and the reasons for its admission have provoked endless discussion; nevertheless such declarations, at least if they are made in the defendant's presence during the commission of the crime or "in furtherance of the conspiracy," are admissible.[3]

■ Defendant further contends that the State failed to make proper disclosure as required by Rule 25.03(A)(2). The State's undercover agent had several conversations with the defendant. All except one were recorded and the existence of the recorded conversations was made known to counsel for the defense. Nonetheless counsel as-

---

**2.** See Model Penal Code Part II § 223.6, pp. 237–39 (Official Draft and Revised Comments 1962); Perkins, Criminal Law 327–29 (2d ed. 1969).

**3.** *State v. Peters,* 123 S.W.2d at 38; *State v. Bunch,* 333 Mo. at 23, 62 S.W.2d at 442[8];

*State v. Sykes,* 191 Mo. 62, 78–79, 89 S.W. 851, 855 (1905). See generally, *Van Riper v. United States,* 13 F.2d 961, 967 (2nd Cir.1926), cert. denied 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926); 4 Weinstein and Burger, 2 Evidence pp. 801-166—801-170 (1981).

serts that because the first telephone call of July 20 was not disclosed, the trial court should have excluded the testimony concerning that call and the subsequent conversation. Upon trial, the State simply answered that this conversation had not been disclosed because the prosecuting attorney was not aware of its existence until the date of trial.

■ It is to be noted that the evidence which was not disclosed did not tend to exculpate the defendant. The substance of the statement was that Burk called his informant but defendant "came on the line" and instructed Burk to meet her at a residence in north Springfield. As defendant concedes, the trial court's refusal to apply sanctions was a matter addressed to the discretion of that court. *State v. Royal,* 610 S.W.2d 946, 951 (Mo. banc 1981); *State v. Sykes,* 628 S.W.2d 653, 656 (Mo.1982). That discretion will be held to have been abused only if the failure to provide discovery results in fundamental unfairness or prejudice to the substantial rights of the defendant. *Sykes* at 656. The evidence which was not disclosed was in no wise essential to the State's case; there would have been little or no hiatus in Burk's testimony if the conversation had been omitted. We perceive neither fundamental unfairness nor prejudice to the substantial rights of the defendant. The point is devoid of merit on the record presented.

■ Another point, very obliquely tendered, is that the trial court erred in denying defendant's motion *in limine* "to prevent the prosecutor from . . . making any reference to convictions that have been received [sic] by Ms. Hurd. . . . The convictions are pending on appeal . . . ." When the motion was made, the State's response was that the 1981 amendment to § 491.050 had the effect of making prior pleas of guilty, pleas of nolo contendere and findings of guilty admissible for impeachment even if no judgment of conviction were ever entered upon the plea or finding, therefore the pendency of an appeal would be immaterial. The trial court denied the motion *in limine* and the defendant did not testify.

As we read the record, and despite counsel's assertions to the contrary, the trial court indicated its willingness to consider the matter further if the defendant took the stand. Counsel conferred with the defendant after the trial court ruled on his motion *in limine,* and announced he felt he "could not" allow the defendant to testify because the court had indicated it would allow impeachment by showing convictions pending on appeal. There is, in fact, no indication how the trial court would have ruled *if* the defendant had taken the stand and *if* the State had elected to try to impeach her by inquiry about prior convictions.

Before the trial court, defendant argued that the 1981 amendment to § 491.050, Laws of Mo.1981, 635–636, did not change the rule that convictions pending on appeal may not be shown to impeach a witness, as held in *State v. Blevins,* 425 S.W.2d 155, 158–159[3–6] (Mo.1968). The State argued and maintains here that the General Assembly amended § 491.050 so as to provide that the plea or finding necessary to enter a judgment of conviction is in itself a sufficient basis for the impeachment of a witness. Here, the parties advance the specious argument that in *State v. Ritterbach,* 637 S.W.2d 820, 824 (Mo.1982), this court held that the 1981 amendment of §·491.050 negated the decision in *Blevins,* whereas in *State v. Morris,* 639 S.W.2d 239, 240 (Mo. App.1982), the court equated the word "conviction" with the phrase "pleas of guilty, pleas of nolo contendere and findings of guilty." In reality the court did not directly address nor resolve the impact of the 1981 amendment of § 491.050 on *Blevins* in either *Ritterbach* or *Morris.*

Noting that our colleagues at Kansas City ruled squarely against the defendant in *State v. Jackson,* 651 S.W.2d 547, 548–549[1] (Mo.App.1983), and that *Jackson* was handed down well before this appeal was submitted, we have the view that defendant's point is not properly before us. There are exceptions, but in general a motion *in limine,* without more, preserves nothing for review. See, e.g., *United States v. Fay,* 668

F.2d 375, 379[6] (8th Cir.1981); *United States v. Johnston,* 543 F.2d 55, 59 (8th Cir.1976); *State v. Scott,* 647 S.W.2d 601, 610, n. 3 (Mo.App.1983); *State v. Savu,* 560 S.W.2d 244, 245[2] (Mo.App.1977). The rationale of such holdings is that a party is not entitled to an advance ruling on the admissibility of evidence which *may* be introduced. Here, the question now tendered was not taken up at an orderly pretrial conference; the motion *in limine* was not made until the State had presented its case-in-chief, and even then the motion was made orally. The assignment of error smacks of hindsight; there is no indication how the trial court would have ruled *if* the defendant had taken the stand and *if* the State had tried to impeach her by inquiry about convictions pending on appeal. We refuse to join in such an ambush upon the trial court.

█ The final point for our consideration is defendant's assertion that the trial court erred in failing to grant defendant's application for a change of venue because extensive pretrial publicity prejudiced the defendant "and she was unable thereby to receive a fair and impartial trial by the inhabitants of Greene County." The defendant does not allege error of constitutional dimension, but in effect she has asserted that she was denied her sixth amendment right to trial by an impartial jury, albeit on an unsound thesis.

An application for change of venue having been filed, the trial court heard the testimony of six randomly selected witnesses concerning their knowledge of the defendant's criminal past. It is made to appear that the defendant was charged with murder and acquitted thereof at some time prior to the commission of the offense with which she is charged here. It was also stipulated that the event received "extensive media coverage" but we are not told what was printed or aired about the de-

fendant. We are thus without any record or document from which to ascertain the tenor of the publicity afforded by the news media. Those of us who reside in Springfield have some recollection of the incident, but of course we cannot fairly supplement the record with our personal and extrajudicial knowledge. *H____ v. D____,* 373 S.W.2d 646, 655 (Mo.App.1963); 9 Wigmore, Evidence § 2569 (Chadbourn rev. 1981); McCormick, Evidence § 329 (2d ed. 1972). We cannot, therefore, determine whether the publicity was lurid and inflammatory or was, on the other hand, as fair and objective as one might expect in the circumstances. All that was established at the hearing was that six randomly selected witnesses had knowledge of the defendant's criminal past and one witness considered the defendant to be "notorious." We can and do notice census statistics, *Moulder v. Webb,* 527 S.W.2d 417, 419 (Mo.App.1975), and therefore we know that the population of the 31st Judicial Circuit from which a venire might be summoned is about 185,000. Only a part of the general public is eligible for jury duty, but a demonstration that six individual persons randomly selected from 185,000 inhabitants had knowledge of defendant's criminal past, and that one of those persons considered the defendant "notorious" scarcely amounts to a showing of that pervasive community hostility which would mandate a change of venue.[4]

█ Defendant further argues that she was prejudiced because five of the thirty-six veniremen summoned were familiar with her criminal past, and twenty-four were familiar with her name. She does not undertake to demonstrate that any particular venireman who was sworn after voir dire was actually biased. There is no contention that the jury was not lawfully summoned or that any member was not statutorily qualified. It is a sufficient answer to this contention to quote from *Irvin v.*

4. See, generally, *Murphy v. Florida,* 421 U.S. 794, 799, 802–03, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 594, 596 (1975); *Baldwin v. Blackburn,* 653 F.2d 942, 948 (5th Cir.1981), cert. denied 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982); *Martin v. Warden, Huntingdon* *State Corr. Inst.,* 653 F.2d 799, 804–06 (3d Cir. 1981), cert. denied 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982); *Project,* Twelfth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1981–1982, 71 Geo.L.J. 339, 625 (1982).

*Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Stating that the sixth amendment guarantees those criminally accused the right to be tried by a panel of impartial, "indifferent" jurors, the United States Supreme Court also stated:

> [S]carcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.... To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (Citations omitted).

Id., 366 U.S. at 722–23, 81 S.Ct. at 1642–43, 6 L.Ed.2d at 756.

■ The only fact defendant has argued here, or attempted to demonstrate in any manner, is that widespread knowledge of her criminal past in the vicinage where she was tried was somehow grossly prejudicial. The existence of such knowledge in Greene County, if it in fact existed, was not sufficient of itself to make her trial inherently unfair. *State v. Brookins,* 468 S.W.2d 42, 45 (Mo.1971); *State v. Owens,* 537 S.W.2d 209, 210 (Mo.App.1976). There is no proof that any juror was impermissibly biased, and the point is without merit.

There is no error, plain or otherwise, in any respect fairly preserved and presented in this court. Accordingly, the judgment is affirmed.

MAUS, P.J., and PREWITT, J., concur.