**STATE of Missouri, Respondent,**

v.

**Emitt FOSTER, a/k/a John Lee, Appellant.**

**No. 66663.**

Supreme Court of Missouri, En Banc.

Nov. 21, 1985.

Rehearing Denied Dec. 17, 1985.

---

Dave Hemingway, St. Louis, for appellant.

William L. Webster, Atty. Gen., and John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Emitt Foster, also known as John Lee, was convicted in St. Louis County Circuit Court of the execution-style capital murder [1] of 26-year-old robbery victim Travis Walker and sentenced to death. The jury rejected defendant's claim of alibi and in this appeal he does not challenge the sufficiency of the evidence to support his conviction. He seeks reversal for various alleged trial errors and, alternatively, that his punishment be reduced to life imprisonment without parole for 50 years. We affirm.

On November 20, 1983, Travis Walker and 19-year-old DeAnn Keys were living together in a St. Louis County apartment. Both knew defendant and Michael Phillips, the three men having been members of the same softball team. About 2 o'clock in the morning defendant and Phillips came to the Walker apartment, ostensibly seeking assistance because of a flat tire on Phillips' car. Shortly after they arrived, the two men produced pistols and forced Walker and Keys to lie face down, side by side, on the living room floor and demanded to know where Walker's jewelry was located. While defendant stood over Walker, poking the prone man in the head with his pistol, Phillips ransacked the apartment. Phillips also put the barrel of his pistol in Keys' ear while demanding Walker to tell the whereabouts of more jewelry. Walker kept telling the twosome that except for his watch, his jewelry was at his Mother's and begged them not to take his watch because it had belonged to his deceased father.

Later, and having taken Walker's watch and jewelry belonging to Keys, Phillips stated he and defendant were leaving and warned the couple on the floor not to try to follow them. When Phillips said this he was near the front door, near Keys, and defendant was still standing over Walker, pistol in hand. Keys heard a gunshot and then felt a gunshot and lost consciousness. When she "woke up" she was bleeding

---

1. Defendant was convicted under § 565.001, RSMo 1978, which has since been repealed. Under present Missouri law, first degree murder is the only homicide offense for which the death penalty may be imposed. *See* § 565.020, RSMo Supp.1984.

heavily from four gunshot wounds to her head. The four .38 caliber bullets had fractured her skull, jaw, several facial bones, and teeth but missed her brain. Walker was lying dead beside her as a result of four .38 caliber bullets to his head.[2]

Keys, seeking help, went outside the apartment and tried to rouse a neighbor by striking the neighbor's door with a kitchen pot. She then reentered the apartment and tried to telephone the police but the line was dead. Thinking she was about to die from her wounds, she wrote the names "John Lee" and "Michael Philips [sic]" twice on an envelope and put it on her dresser.

A neighbor saw the bleeding Keys when she was outside of her apartment and called the police. Officers arrived shortly after 3:30 a.m. and found Walker dead on the living room floor and Keys lying across the bed. Although she was unable to talk because of her wounds, Keys indicated to the officers that the individuals whose names were on the envelope were the ones responsible for killing Travis Walker and attempting to kill her. Thereafter, she identified photographs of defendant and Phillips and at trial identified defendant.

Defendant did not testify at trial but called several witnesses who testified defendant played cards with them at his mother's house until nearly midnight the night of the crime. Defendant's key alibi witness was his girlfriend, Dorothy Beck Lee, who testified defendant accompanied her to her home after the card game and remained there until about 5:00 a.m.

On cross-examination, witness Lee acknowledged that on November 22 she had given police officers a tape recorded statement which was at odds with her trial testimony in that she had told the officers that shortly after she and defendant arrived at her house the defendant left and did not return until about 4:00 a.m. She admitted having told the officers this and that defendant had told her to "cover for him" by saying he was with her if anyone

made any inquiries; further, that "if I didn't cover for his time ... something would happen to him, he couldn't keep protection on me, so therefore, he couldn't account for what happened to me." She also had told the officers that defendant had a .38 caliber pistol and carried it all of the time, had it on him the night of the crime, and she was "afraid to death myself."

While witness Dorothy Beck Lee admitted making the statement to the authorities, she claimed it resulted from police coercion, threats, misrepresentations, and withholding of needed medication; and that the interviewing officers told her what to say in response to their questions.

By way of rebuttal the State offered the tape recording for the purpose of demonstrating the circumstances existing at the time it was made and not for the truth of the matters contained thereon. The trial court first listened to the tape out of the hearing of the jury and then permitted the tape to be played for the jury after expressly cautioning the jury it was for the limited purpose of showing the circumstances under which it was taken—not for the truth of the statement.

Defendant argues that the State's use of the tape recorded statement worked a violation of his constitutionally guaranteed right to due process.

At the outset it should be emphasized that all of the information contained on the tape had already been before the jury by way of cross-examination of Dorothy Beck Lee. Therefore, defendant cannot argue in good faith that the playing of the tape brought before the jury previously unrevealed information. Even so, defendant suggests it was somehow unfair and constitutionally impermissible to play the full tape when the witness had already been impeached.

■ The transcript shows, and defendant admits in his brief that he, not the

---

**2.** Ballistic evidence showed that the four shots resulting in the death of Walker and the four shots which seriously injured Keys were fired from two different weapons.

State, first injected the issue of coercion of witness Lee into the trial. The defendant raised this issue for the first time during his direct examination of witness Lee. Once the witness abandoned her prior statement and once defendant elicited testimony that the prior statement was the product of police misconduct, the State had not only the right to impeach the witness as to the existence of the prior statement but also the right to show the circumstances surrounding the making of the statement—to rebut the claim of coercion. The defendant voluntarily decided to raise the issue of coercion, and having done so, the State was entitled to play the tape to rebut the defendant's theory of coercion. The playing of the tape was critical and relevant to the State's ability to rebut the claim of coercion—and to the jury's ability to resolve this disputed factual issue.

The tape recording, States' Exhibit 64, has been filed with this Court and we have listened to it. We cannot detect anything in witness Lee's voice and manner of speaking that indicates she was under coercion or duress. Her tone of voice, choice of words, manner of speaking, and narrative form answers to questions are matters that the jury could properly consider in weighing her trial testimony as to the making of the statement. This, in turn, would bring into sharp focus her credibility as a witness. As stated in *State v. Martin*, 651 S.W.2d 645, 653 (Mo.App.1983),

> Any competent testimony which tends to explain, counteract, repeal or disprove evidence offered by the defendant may be offered in rebuttal of defendant's evidence.

We hold there was no error in permitting the jury to hear the tape recording.

■ Ancillary to the foregoing assignment is defendant's complaint of the prosecutor's arguing that the recording disproved witness Lee's charges concerning the making of the tape. We initially note

there was no objection made to the argument and the point has not been properly preserved. Nevertheless, we have reviewed the matter and find no error, plain or otherwise. The prosecutor's remarks were limited to considering the truth or falsity of the witness' allegations of police misconduct in the making of the recording. The point is denied.

Defendant contends the State's "Witherspooning" [*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)] the panel of potential jurors resulted in a "death qualified" trial jury. We have repeatedly rejected this contention. *See State v. Malone*, 694 S.W.2d 723 (Mo. banc 1985); *State v. Nave*, 694 S.W.2d 729 (Mo. banc 1985).[3] The point is denied.

■ Defendant alleges improper argument by the prosecutor during the guilt phase of the trial in connection with the court's instructions. Here again, the point is not preserved for appellate review because of the defendant's failure to make proper and timely objections. However, we have read the arguments in their entirety and find no plain error resulting in manifest injustice. The applicable general rule does not forbid all mention of the law in argument and counsel is permitted to argue the facts as they pertain to the law declared in the instructions of the court. *State v. Jordan*, 646 S.W.2d 747, 751 (Mo. banc 1983). We observe that defendant embarked upon a similar line of argument, but, in any event, conclude that the parties were simply arguing the evidence and inferences from their particular point of view and there was no error calling for reversal.

We have considered defendant's remaining contentions of error during the guilt phase of the trial and do not find any prejudicial error.

We turn now to the second stage, or punishment phase, of the trial.

Defendant assigns error in the trial court's excluding certain evidence during

---

**3.** In support of this argument, defendant relies upon *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. banc 1985), petition for cert. filed sub nom., *McCree v. Lockhart*. On October 7, 1985, the

United States Supreme Court granted certiorari in *McCree,* —— U.S. ——, 106 S.Ct. 59, —— L.Ed.2d ——.

the testimony of defendant's mother. The court sustained the State's objections, based on relevancy, to the following questions: (1) the mother's age at the time of defendant's birth; (2) the fact that defendant's father had died and whether defendant had known him; (3) how many of defendant's brothers and sisters were deceased; and, (4) whether the mother was wealthy.

■ As to (1) and (2), supra, the mother answered she was 15 when defendant was born, and at time of trial defendant's father was deceased, before the objections were made and sustained. The answers were not stricken and no instruction to disregard them was given. Further, defendant made no offer of proof as to what the mother's testimony would have been had no objection been made and sustained. By failing to support his assignment by an offer of proof, defendant has not preserved the point. *State v. Britt*, 504 S.W.2d 38 (Mo.1973). In the main, the trial judge permitted defendant's penalty phase witnesses wide range in their testimony.[4] We fail to see any prejudice resulted to defendant by the court's rulings.

Defendant claims he was entitled to an instruction on the statutory mitigating circumstance that he "... acted under extreme duress or under substantial domination of another person." *See* § 565.012, RSMo Supp.1983 (repealed in 1984 and replaced by § 565.032, RSMo Supp.1984). Defendant tendered such an instruction but it was refused by the court.

■ The insurmountable obstacle facing defendant in advancing this point is, as the trial court correctly stated: "[T]here is no basis in the record to support such a direction to the jury." We agree. We have read the three volumes of the trial transcript, nearly 1000 pages, and there is not one iota of evidence to support the giving of the requested instruction. The trial court properly refused the instruction.

*State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983).

Defendant attacks the imposition of the death sentence on two grounds. First, that the sentence resulted from the influence of passion, and second, that it is excessive and disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.

Section 565.014, RSMo 1978, mandates that this Court review the imposition of the death penalty. Our review includes the entire record and transcript and a report prepared by the trial judge. We are obligated to consider the punishment as well as any errors enumerated by way of appeal [§ 565.014.2] and with regard to the sentence shall determine [§ 565.014.3]:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Defendant's contention that the death sentence was the result of passion is not supported by the record. His attempt to sustain this allegation by reference to various alleged trial errors is without merit. The alleged errors raised by defendant have been ruled against him and those now asserted but not raised will not be considered. However, we note that defendant's real argument of this point is that certain relevant evidence prejudiced the defendant. In *State v. Shaw*, 636 S.W.2d 667 (Mo.banc), cert. denied, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982), we said:

[I]t would be foreign to our concept of criminal jurisprudence to suggest that relevant evidence should be inadmissible

---

4. Including the results of studies, opinions and conclusions of the academic community concerning the lack of deterrence of the death penalty. We have held such type of evidence inadmissible. *See State v. Gilmore*, 681 S.W.2d 934, 941 (Mo. banc 1984).

merely because it tends to prejudice the defendant. *See State v. Wood,* 596 S.W.2d 394, 403 (Mo.banc) cert. denied, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980). Any incriminating evidence is by definition prejudicial. *Id.* at 672.

The jury found four statutory aggravating circumstances: that defendant had a substantial history of serious assaultive convictions (four separate first degree robbery convictions); that defendant murdered the victim for money or thing of monetary value (jewelry); that the murder was committed for the purpose of preventing the robbery victim from testifying in any judicial proceeding (defendant and the victim knew each other); and, that the murder involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman (the execution-style killing by firing four bullets at point blank range into the head of a prone, submissive and helpless human being). The jury's findings are amply supported by the evidence in this case.

After finding, beyond a reasonable doubt, the statutory aggravating circumstances, *supra,* the jury considered all the evidence and recommended the death sentence. The report of the trial judge to this Court, mandated by statute [§ 565.014.1, RSMo 1978] states:

The jury heard and saw clear, uncontradicted and unobfuscated evidence of an execution style killing in which the parties were acquainted and played on or were involved with the same softball team. In the opinion of the Trial Judge, the verdict is in accord with the evidence.

We have reviewed the cases where the death sentence was imposed, as well as the capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury.[5] We conclude the penalty imposed is not excessive or disproportionate to the penalties imposed in similar cases, considering the facts and circumstances of the instant crime and the defendant.[6]

The judgment is affirmed.

HIGGINS, C.J., BLACKMAR, DONNELLY, WELLIVER and RENDLEN, JJ., and SNYDER, Special Judge, concur.

ROBERTSON, J., not sitting.

---

5. Defendant points to the fact that his accomplice, Michael Phillips, was convicted of first degree (felony) murder and sentenced to life imprisonment. Because Phillip's conviction was for a lesser offense, his sentence is not germane to our proportionality review. *State v. Bolder,* 635 S.W.2d 673, 685 (Mo. banc 1982). In *Bolder,* we held: "Relevant cases for a review of the appropriateness of the sentence are those in which the judge or jury first found the defendant guilty of capital murder and thereafter chose between death or life imprisonment without the possibility of parole for at least fifty years."

6. Our conclusion that the death penalty in this case is neither excessive nor disproportionate to the penalty imposed in similar cases considering the crime and the defendant was reached after reviewing a number of representative cases. *See e.g. State v. Malone,* 694 S.W.2d 723 (Mo. banc 1985); *State v. McDonald,* 661 S.W.2d 497 (Mo. banc 1983), *cert. denied* — U.S. —, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982), *cert. denied,* 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983); *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).