STATE of Missouri, Respondent,

v.

Gary L. GRAY, Appellant.

No. WD 37180.

Missouri Court of Appeals,
Western District.

April 7, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1987.

Application to Transfer Denied July 14, 1987.

Robert G. Duncan, Peter M. Schloss, Kansas City, for appellant.

William L. Webster, Atty. Gen., Michael R. Whitworth, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P.J., and DIXON and LOWENSTEIN, JJ.

SHANGLER, Presiding Judge.

The defendants Gray and Ballard were convicted by a jury of first degree murder for the homicide of Roy Keck in the course of robbery. § 565.003 RSMo 1978. The defendants were sentenced to terms of life imprisonment. Gary appeals from the judgment of conviction.

The victim Keck, 92 years of age, was found in his house in St. Joseph, on the floor, nude and severely beaten. His daughter Bess Thomas had come for a periodic visit and found him there on Tuesday, September 13, 1983, at about 11:40 a.m. She saw no sign of life and went for help. She soon returned with Officer Boulting and Frank Dykes, a neighbor. They found the victim semi-conscious, and covered with bruises and dried blood. Keck was removed to a hospital where he died on September 24, 1983, eleven days later.

An inspection of the premises by Officer Boulting disclosed that a window screen appeared to have been forced inward. There was dried blood throughout the interior—on a door latch, the refrigerator and carpets. There was evidence of an apparent absence of fesces or urine on or about the victim. A police technician obtained items from the interior home, among them a shaving cream can. Two fingerprints on the can were identified as those of the defendant Gray.

The examination of the victim at the emergency room of the hospital disclosed a fracture of the cheek bone, puncture wounds of the chest, cuts and bruises over the back, a fractured right wrist and a contusion of the brain. He also suffered from subcutaneous emphysema, a condition which results from a pierced lung. There was medical testimony that these injuries were consistent with the conclusion that they were inflicted by a severe beating several days before. The testimony at the trial by Dr. Vyas, who performed the autopsy, was that the trauma to the brain suffered 12 to 14 days before impaired the respiratory function, caused pneumonia and eventual death.

On November 28, 1984, Gray and Ballard were charged with the murder of Keck in the commission of a robbery on about September 9, 1983. That was the outcome of an immunity agreement concluded by the prosecutor with one Jerry Smith wherein Smith agreed to give truthful testimony and to cooperate in the investigation of the Keck death in exchange for immunity from prosecution for any act relating to the death. Smith also obtained releases from civil liability from the members of the Keck family. Smith thereupon gave a statement to the police that on September 9, 1983, Smith agreed for $1000 to drive Gray and Ballard to the Keck house to rob him. Gray and Ballard got out of the vehicle—and Gray obtained a knife from the dashboard as he did. Smith drove around a few blocks, then parked two blocks away and waited. After fifteen minutes, Gray and Ballard came up the street, and Smith picked them up. It was then about 1 a.m. Gray had a billfold and money bag in hand. Ballard remarked: "I think we really did it this time." Gray commented to the effect that he didn't think "the old man would be that tough."

The date for the trial of the case was set, and the defendant Ballard brought a separate motion for change of venue. The ground argued was that certain newspaper articles and other pretrial publicity had been inflammatory and prejudiced the defense. The defendant Gray acknowledged the extensive media coverage of the case, and that although the coverage was biased, a fair trial in St. Joseph remained possible if the court would allow sufficient latitude on that issue during the voir dire of prospective jurors. The court expressed an inclination to make the accommodation if the publicity before trial warranted, but denied the Ballard motion because it was

not shown the publicity up to that time impaired a fair trial.

On March 27, 1985, some five weeks after the hearing on the change of venue was conducted, the St. Joseph Gazette published an article which prompted a successive motion for change of venue—this time, by both defendants. This article displayed by the headline "Material Witness in Keck Murder Located," reported that a material witness had been located in Las Vegas who said that Ballard and Gray asked him to assist them in the robbery of an old man. It reported further that the witness had been apprehended and turned over to the St. Joseph police. The person, James Mollett [a cousin of Gary Gray] was expected to be a key witness in the Keck trial, the article said, because of a statement he had given the St. Joseph police on November 21, 1984. In that statement, the article continued, Mollett had told the police that he had refused the request of the defendants to drive an escape car for them so that they could rob an old man. That article also described a guilty look he had seen on Gray's face during a television news report about the Keck event.

In addition to the rendition of these details, the article reported also:

"Mollett's statement to police partially corroborates a statement made by another state witness at Ballard and Gray's preliminary hearing. At the hearing, Jerry Smith, 2013 Jamesport Road, testified that he had driven the two defendants to the neighborhood around Keck's home at 2529 S. 15th St. on Sept. 9 or 10, 1983.

"Smith said that the defendants had said they were going to rob an old man and that he should come back and pick them up later. He said they took a fish filleting knife from the dashboard of his pickup truck with them when they got out.

"When he returned later, he said Ballard and Gray got back in the truck with a billfold and a money bag, and that they did not return the knife."

A hearing was conducted on the motion for change of venue, and evidence was presented. Two attorneys with criminal defense practices gave opinion that as a result of the newspaper article the defendants could not receive a fair trial in the St. Joseph venue, nor could even an extensive voir dire "erase the infection from the mind of potential jurors" instilled by that publicity. The court tentatively denied the motion, but agreed to allow counsel on the voir dire to question each veniremember individually as to "their exposure to the news media." The court reserved final decision as to the change of venue until the veniremembers expressed their opinions in the voir dire process "in relation to exposure to the news media."

The venire was divided into three panels. The first was composed of 36 persons. Five among them were struck for cause on general voir dire for reasons other than exposure to pretrial publicity. The individual questions then began. Sixteen of the 31 who remained were struck for cause on pretrial publicity grounds. In addition, another was struck for an extraneous reason. Fourteen veniremembers remained. The trial judge was not satisfied with the course the inquiry of the individual veniremembers had taken as to the effect of the media coverage on their opinions and ability to serve as fair jurors. He described the process to counsel as "confusing and misleading to the panel members, that the panel members were confronted with the repetition of questions which challenged over and over again statements that they had made." He added the impression that "the whole process was intimidating" and not productive as the means "to obtain a fair and impartial panel of jurors." The court informed counsel that "in order to cure and eliminate that process" he intended to "take over the questioning of the jury panel in relation to the media question— media questions." The court provided counsel a copy of the questions he proposed to put to the veniremembers on that issue. The prosecution acceded to that procedure, but counsel for Ballard objected strongly, and contended that the court had thereby repudiated the announced commitment to allow the attorneys to perform that function. Counsel for Gray also objected,

and argued also that "it takes the questioning of counsel to bring out whatever preconceived notions they may have."

The court overruled these objections and the voir dire of the second and third panel of veniremembers on the issue of pretrial publicity was conducted by the judge. The procedure adopted by the judge was to ask a series of questions on pretrial publicity before the inquiry proceeded to the general voir dire. The interrogation by the court, and the qualification process, followed this paradigm:

COURT: Okay. Mr. Swing. Do you recall that I informed you yesterday that the case—that the jurors that are selected will hear is the case of State versus Ballard and Gray, which involves an alleged murder of a Mr. Roy Keck?

SWING: Yes, Sir.

COURT: All right. Have you seen anything on television about this case?

SWING: No.

COURT: I mean at any time; recently, or some time ago?

SWING: Vaguely. There has been much, at the start, remember exactly—I remember some things that I've heard on the radio.

COURT: Okay. So you have heard something on the radio then?

SWING: Yes.

COURT: And was that recently or some time ago or when did you hear it?

SWING: Oh, within the last week.

COURT: Within the last week? Okay. Have you read anything in the newspaper about this case?

SWING: A little bit.

COURT: And when was that; do you recall?

SWING: Yeah, I'm not—

COURT: Mr. Swing, do you believe that things are true just because they're reported by the news media?

SWING: No.

COURT: Mr. Swing, the State is required to prove beyond a reasonable doubt that the crime of murder was committed and that the Defendants committed it. Will you require the State to do that if you're selected as a juror?

SWING: Yes.

COURT: Mr. Swing, regardless of what you have heard or read about this case, can you wipe the slate clean and require the State to prove that a murder was committed?

SWING: Yes.

COURT: Do you have any reservations at all about your ability to do that?

SWING: No.

COURT: Can you keep an open mind in this case, Mr. Swing, and not come into the case with any preconceived assumptions that the crime of murder was committed, or that the Defendants, or either of them, committed it, and base your decision solely on the evidence you hear in this trial and the law as given to you in the instructions of the Court?

SWING: Yes.

COURT: All right. Thank you very much, Mr. Swing. Would you remain available in the vicinity of the jury room?

Counsel for Ballard, Mr. Kranitz, challenged the veniremember Swing for cause, on the same ground registered for the previous veniremember qualified by the court on the pretrial publicity issue: that "[Swing] has been inadequately voir dired, and we've not been able to find—discover what his mind-set is in regard to this matter." The court overruled the objection. The court on occasion, however, sustained objections by counsel to the formulation of its questions, and corrected them. Under the procedure of voir dire interrogation adopted by the court, a juror who could not, "regardless of what [the juror] heard or read about the case ... wipe the slate clean and require the State to prove that a crime was committed" was disqualified.

The second panel of veniremembers, as the first, consisted of 36 persons. Nine members were excused for cause; six of them were based on pretrial publicity. The third group consisted of 31 persons. Fourteen members were excused for cause;

twelve of them were based on pretrial publicity. A jury was selected from those qualified. There is no intimation that any of the persons finally selected to serve as jurors had already formed an opinion before the commencement of the trial about the guilt or innocence of the defendant.

## I

Gray, the sole appellant, argues first that his Sixth Amendment right to trial by an impartial jury and his Fourteenth Amendment right to due process were violated by the denial of the motion to change the venue from Buchanan County and the refusal of the court to allow counsel to conduct individual voir dire of the second and third panels on the issue of pretrial publicity. Gray argues that a probe by counsel would have been more intensive and therefore more effective to discover pervasive bias in favor of conviction, and hence to prove cause for change of venue. Gray acknowledges that an order to change venue as well as the conduct of the voir dire are exercises of authority within the sound discretion of the trial court, and neither will be upset on appeal except for manifest abuse. *State v. Molasky*, 655 S.W.2d 663, 665[1] (Mo.App.1983); *State v. Bannister*, 680 S.W.2d 141, 145[7, 8] (Mo. banc 1984). Gray acknowledges also that merely because a preponderance of the venire acknowledges exposure to pretrial publicity does not prove cause that the change of venue must be granted. Indeed, "[i]n order to find an abuse of discretion, it is necessary to conclude that the record permits no interpretation other than that 'the minds of the inhabitants of the court ... are so prejudiced against the defendant that a fair trial cannot be had therein.'" *State v. Molasky*, 655 S.W.2d at 666.

Gray argues, however, that the "combined effect" of the denial of change of venue and the conduct of voir dire on the issue of pretrial publicity "make this case one for special consideration" and worked to deny him of his rights under the Sixth and Fourteenth Amendments. The posture of the argument notwithstanding, the defendant does not exposit the constitutional arguments, but merely cites aphorisms from the appellate decisions of our courts, none of them congenial to the contentions of error and reversal. In fact, *none* of the decisions Gray cites in argument finds or reverses for error in the denial of a change of venue or in the conduct and control of the voir dire.

■ The constitutional rule as to pretrial publicity, juror qualification, and change of venue in a criminal trial is defined in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The state trial involved the prosecution and conviction of "Murph the Surf," a notorious jewel thief. He was convicted of the murder of two secretaries and then brought a federal habeas corpus petition on allegations that the rejection of a change of venue in the state action infringed his right to a fair trial. In that trial, 20 of the 78 venire panelists were excused because they harbored an opinion concerning Murph's guilt. It was the argument on habeas corpus that the high incidence of excusals based on pretrial publicity proved an atmosphere so poisoned from that cause as to deny him the right to a fair trial.

*Murphy* acknowledged [*Id.* at 798, 95 S.Ct. at 2035] that the Supreme Court had in earlier cases "overturned a state court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." It nevertheless rejected the contention that even a pervasive exposure to news media accounts about the crime on trial, *per se*, presumptively proves a deprivation of juror impartiality, and hence, of a fair trial [*Id.* at 800, 95 S.Ct. at 2036]

"Qualified jurors need not ... be totally ignorant of the facts and issues involved.

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence in court.'"

*Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) reaffirms

that the question relevant to the determination whether a criminal jury is impartial despite pretrial publicity "is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* at 1035, 104 S.Ct. at 2891. That is the very standard our decisions intone. *State v. Carr,* 687 S.W.2d 606, 612[10–12] (Mo.App. 1985); *State v. Hurd,* 657 S.W.2d 337, 342[10] (Mo.App.1983); *State v. Molasky,* 655 S.W.2d at 666. That is the very standard the trial court applied to adjudge the qualifications of the jurors and the motion for change of venue. *Patton,* moreover, confirms the principle that it is not the pervasive media publicity, but pervasive community hostility which would make a fair trial by a jury unlikely, and so compels a change of venue as a matter of constitutional right. *Patton,* 467 U.S. at 1040, 104 S.Ct. at 2893; *State v. Hurd,* 657 S.W.2d at 342. It is the principle of *Patton* [467 U.S. at 1033, 104 S.Ct. at 2889] that in the absence of evidence of a " 'barrage of inflammatory publicity immediately prior to trial' ... amounting to a 'huge ... wave of public passion,' " the affirmation of the veniremembers that they can be impartial suffices to establish an impartial jury, selected and impaneled. There was no evidence that the Keck murder was given such wide and inflammatory publicity immediately prior to trial as to raise the presumption of impartiality of a prospective jury.

Nor was the validity of the juror qualification process impaired by the decision of the trial court to disallow counsel from the separate voir dire of the veniremembers of the second and third panels. In our jurisprudence, the parties have no independent right to voir dire the panel members separately. *State v. Chaney,* 663 S.W.2d 279, 286[16, 17] (Mo.App.1983). The conduct of that trial function reposes within the discretion of the court and will not be disturbed unless manifestly abused. *State v. Bannister,* 680 S.W.2d at 145[7, 8]. The trial judge wrested the prerogative granted counsel to conduct such individual inquiries after he concluded that counsel,

by frivolous challenges and distortions of the responses, abused the privilege. The record sustains that basis for conduct. The process, as resumed by the trial judge, was scrupulously objective and fair. There is no evidence that any of the veniremembers finally selected had already formed an opinion about the guilt of the defendants.

## II

The next claim of error relates to the examination and testimony of James Mollett, called as a witness for the prosecution. On November 21, 1984, Mollett had given a statement to police officer Otto Clayton about the Keck incident. To the question of the prosecutor whether, on September 9, 1983, Mollett had occasion to be with Jerry Smith, Ballard and Gray, and whether the defendants had approached him "about anything that night," Mollett answered that Ballard and Gray wanted him to give them a ride uptown. To the question: "Did they tell you why they wanted you to drive them uptown? ", Mollett responded, "No." To the question: "Were you going to be paid something? ", Mollett responded, "Yes. I don't know what." The prosecutor thereupon informed the court that the answers on the stand were contradicted by the earlier statement given by witness Mollett to police officer Clayton, and so asked and was granted leave to treat Mollett as a hostile witness. The writing was displayed to the witness, who confirmed that his signature subscribed the statement. The witness acknowledged also that he had spoken the words to the officer: "[T]hey wanted me to drive a car uptown to rob an old man ... I was to get $300 or $400 for doing this"—but that the narrative was not true. The witness responded also that he had changed his statement "before [the police] brought me back [from] Las Vegas." The defense counsel then elicited that he had no "fair recollection" that he met with Gray and Ballard on the night of September 9, 1983.

The prosecutor then reexamined:

Q. Is it true that you were at Chuck Ballard's house trailer; his wife and

Gary Gray and Sharon Barry were there?

A. Yes.

Q. The news came on and it was about Roy Keck?

A. Yes.

Q. Is it true that you looked over at Gary Gray; and I know by—and you knew by the look on his face what had happened?

A. That's what I assumed.

Q. Okay. And by "what happened," would you tell the jury what you knew had happened?

MR. KRANITZ: Object. He said, "assumed." He didn't say he knew.

THE COURT: Overruled.

Q. You can answer.

A. You want to repeat it, the question.

Q. What did you know had happened by the look on their face?

A. Well, I thought that is why—what I had been asked to do, and that's why I was saying that I assumed that, you know, that's what happened.

Q. Okay. Did they promise to pay you any money for driving a car?

A. Yes. They said they'd give me some money. That's about it.

. . . .

Q. Do you recall making that statement to Otto Clayton, "I was going to get $300 or $400 for doing this." ?

A. Yes. That was just off the top of my head now.

The defense counsel resumed examination and elicited once again from witness Mollett that he signed the statement, but it was signed "under pressure," and wasn't true. He explained: the police told him "to cooperate, you know, cooperate with them or I could be brought in as an accessory to the fact." Then he described the site of the interrogation in the police building as "a little room" behind a closed door "with blinds drawn so you couldn't see out." He was "scared." The police—Officer Clayton and two others—despite his signature on the Waiver of Rights, did not ask him if he wanted to see an attorney. Also, despite the x on the line of the statement which

indicates, "Read aloud by suspect," Mollett had no memory that he placed the mark there or that he read the statement aloud to the police.

The prosecution then called Officer Clayton as a witness. He identified the statement given to him by Mollett and the separate Waiver of Rights and the signature by Mollett on each of them. Clayton testified that Mollett read the statement of rights aloud and then signed the waiver. He then described how the statement was composed: "We went over his statement verbally. I started writing and he told me again what took place." Then the Saturday afternoon before the commencement of the trial, he went over the statement again with Mollett at his home—"word for word, the whole thing." The inquiry then continued between prosecutor Insco and witness Clayton:

INSCO: Officer Clayton, did you review specific details of the statement which Mr. Mollett gave you previously with him on last Saturday?

CLAYTON: Yes.

INSCO: What details did you review with him?

CLAYTON: How much money he was supposed to get for driving the car. What his purpose was in going to drive them uptown.

INSCO: Did he tell you, at that time, what was a true and correct statement?

CLAYTON: Yes.

INSCO: And what did he tell you?

. . . .

And what did he tell you as regards to the money?

CLAYTON: He was supposed to get between $300 and $400 for driving them uptown to rob a man, old man.

INSCO: Okay. And what about as to— what else did you review with him?

CLAYTON: Where they were when a conversation took place between Mr. Gray and Mr. Ballard and himself.

INSCO: And what did Mr. Mollett tell you?

CLAYTON: He said that they were at the grocery store, which is located

across from Kirchner School in the south end, and Mr. Gray and Mr. Ballard had approached him to drive the vehicle for this purpose, and he answered, no, he wouldn't do it.

. . . .

INSCO: Okay. And did you review any detail with him concerning a later period at someone else's house?

CLAYTON: Yes, I did.

INSCO: Okay. What detail did you review with him then?

CLAYTON: He said he was over at Mr. Ballard's house trailer, and Mr. Gray and Sharon Barry was there. The news came on, and it was about Mr. Keck. Mr. Mollett stated, "I looked over at Gary Gray, I knew by the look on his face what had happened."

INSCO: Did he tell you that was a true and correct statement?

CLAYTON: He did.

INSCO: Last Saturday?

CLAYTON: Yes.

It was the trial objection by the two defendants Gray and Ballard, and now the point on appeal by defendant Gray, that the prosecutor was erroneously allowed to use the extrajudicial statement of witness Mollett not only to impeach the witness, but as substantive evidence of its content through the separate testimony of Officer Clayton. The error was compounded [the argument goes] when the court allowed the prosecutor to elicit, first from witness Mollett that he knew "by the look on [Gary Gray's] face what had happened," and then from witness Clayton that Mollett reconfirmed the truth of that element of the statement.

In support of the argument, defendant cites the rule in *State v. Granberry*, 491 S.W.2d 528 (Mo. banc 1973)—the orthodoxy at the time of this trial[1]—that

" '[E]vidence of extrajudicial statements made by a witness who is not a party and

whose declarations are not binding as admissions is admissible only to impeach or discredit the witness, and is not competent as substantive evidence of the facts to which such statements relate.' " *Id.* at 530. The record, however, discloses no such abuse of the extrajudicial statement either through the interrogation of witness Mollett or of Officer Clayton.

■ In the case of Mollett, the allusion to Exhibit 41 [the statement given by the witness to the police on November 21, 1984] was prompted by his answer that on September 9, 1983, when defendants Ballard and Gray had asked him to drive them uptown, they did not tell him why they wanted him to drive them uptown. It was then that the prosecutor was allowed to display to the witness Exhibit 41, which Mollett acknowledged was his statement subscribed by his signature and given to Officer Clayton November 21, 1984. It was then that the prosecutor asked the witness whether he recalled that he made the statement: "Gary Gray and Chuck Ballard got me off to one side and asked me to drive a vehicle . . . And they wanted me to drive a car uptown to rob an old man. . . . " Mollett recalled the statement, but repudiated it as not true. Mollett said, moreover, that he had told the police he had repudiated the statement before he was "brought back from Las Vegas" to give the testimony. It is clear that the content of the prior statement—that "they wanted me to drive a car uptown to rob an old man" was in clear contradiction with the trial testimony that the defendants did not tell the witness why they wanted him to drive them uptown. The prior extrajudicial statement was properly used for that impeachment. *State v. Torregrossa*, 680 S.W.2d 220, 229[15] (Mo.App.1984).

There was no other allusion by the prosecutor to the prior written statement, as

---

1. That rule was effectively repealed as to criminal trials by § 491.074, RSMo Cum.Supp.1987, on July 19, 1985:

   Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substantive evidence, and

the party offering the prior inconsistent statement may argue the truth of such statement. The trial of the case under review, prosecuted under § 565.003, commenced on April 1, 1985, and so was not affected by the enactment of § 491.074. That rule as it appertained to civil trials was judicially abrogated in *Rowe v. Farmers Ins. Co.*, 699 S.W.2d 423 (Mo. banc 1985).

such, in the rest of the examination of witness Mollett. The prosecutor, indeed, made a tentative gesture to confront the witness with excerpts from the prior statement, and with no purpose to impeach, but was precluded by the objection of defense counsel and the direction of the court. Then followed the question and answer colloquy between the prosecutor and witness Mollett the opinion already replicates, as to what he observed at the Ballard home on September 9, 1983 on the occasion of the newscast. The witness recalled that "the news came on and it was about Roy Keck" and acknowledged that he "looked over at Gary Gray ... and knew by the look on his face what had happened." These questions, however, merely asked for a narrative of observed events and not to confirm the truth of a prior extrajudicial statement, as such. The defendant Gray complains, however, that the response elicited from Mollett and allowed to stand before the jury was merely the rendition of opinion, and hence was inadmissible for that reason alone. We determine, rather, that the evidence was competent and relevant for reasons we presently state. The testimony of witness Mollett was properly received and not tainted by the errors the defendant contends.

■ The testimony of Officer Clayton was no less valid. He was called to rehabilitate the statement given to him by Mollett on November 21, 1984, not only as to content but as to its rendition as a voluntary expression. Mollett was interrogated as a witness hostile to the prosecution. When confronted with the statement Mollett admitted that it was in fact given in the terms expressed and subscribed by him, but asserted that it was the result of duress. [It was a theme avidly exploited by the later examination of the witness by the defense.] Mollett testified, moreover, that he communicated his repudiation of the statement to the police before they returned him from Las Vegas. In the face of the assertion by the witness that the prior statement was the product of police misconduct, the prosecution "had not only the right to impeach the witness as to the existence of the prior statement but also the right to show the circumstances surrounding the making of the statement to rebut the defendant's theory of coercion." *State v. Foster*, 700 S.W.2d 440, 443 (Mo. banc 1985).

In circumstances, such as in *Foster*, where the statement reposes in a tape, the playback of the *full* tape [the court determined] "was critical and relevant to the State's ability to rebut the claim of coercion—and to the jury's ability to resolve this disputed factual issue." *Id.* That is because the "tone of voice, choice of words, manner of speaking, and narrative form answers to questions are matters that the jury could properly consider in weighing her trial testimony as to the making of the statement." *Id.* In circumstances here, although the statement is a writing and not the tape of a voice, the analogy of *Foster* nevertheless holds. That is so because the rehabilitative testimony of Officer Clayton was that the statement was never repudiated, but was in fact reaffirmed *after* the event of repudiation claimed by the witness, and reaffirmed "word for word" in specific detail. The rendition of the sequence of those specific details of the true content of the statement was competent, as in *Foster*, not for its substantive truth, but to prove that the statement, detail by detail, was uncoerced.

The question remains nevertheless whether the fragment of the Mollett statement and testimony—that as Mollett watched a news report about the Keck robbery at the Ballard home, he looked over at Gray and "knew by the look on his face what had happened"—was competent evidence. That report came through direct questions to Mollett and through the testimony of Clayton as one of the details reconfirmed to him by Mollett. The defendant contends that the evidence violates the rule that a lay witness may not give opinions or conclusions, but must relate facts. *See State v. Thomas*, 536 S.W.2d 529 (Mo. App.1976).

■ It remains the general rule that a witness must state facts from which the jurors form the opinion. *State v. Morrow*,

541 S.W.2d 738, 742[8] (Mo.App.1977). When a witness has personally observed events, he may testify to "his 'matter of fact' comprehension of what he has seen in a descriptive manner which is actually a conclusion, opinion or inference, if the inference is common and accords with the ordinary experiences of everyday life." *Id.* The court allowed the evidence on that very basis. It is a practice justified by convenience and even necessity. It is convenient as a "short-hand rendition" of a composite situation. C. McCormick, *Evidence* § 11 (3d ed. 1984). It may be necessary to allow such evidence in order not to risk its loss. For in such a case where it is extremely difficult or impossible for a witness to convey an accurate sense of the observed events if confined to a statement of facts [in the orthodox sense], the evidence would be simply lost to the jury. *State v. Thomas,* 536 S.W.2d at 532. In this case, in fact, what the witness meant by his statement that he "knew by the look on his [Gray's] face what had happened" was amplified by the next question of the prosecutor and the response of the witness:

Q. What did you know had happened by the look on their face?

A. Well I thought that that is why—what I had been asked to do, and that's why I was saying that I assume that, you know, that's what happened.

The evidence to which the defendant Gray makes objection was, indeed, a "short-hand rendition" of the entire transaction between the defendants and witness Mollett, and was properly received.

## III

■ The defendant next contends that the court erred in the failure to submit a manslaughter instruction as a lesser included offense of murder first degree. The contention appears to rest on the assumption that the Notes on Use applicable to the 15.00 series of MAI–CR2d required that the court instruct down from first degree murder to manslaughter. We observe, first, that the contention was not preserved in the motion for new trial. We observe, second, that the automatic submission rule

expressed in the MAI–CR2d 15.00 series was repealed by § 565.025.3, RSMo 1986. Moreover, § 556.046.2 provides: "The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *State v. Romesburg,* 703 S.W.2d 562, 566[4, 5] (Mo.App.1985). Manslaughter is the "intentionally killing of a human being in the heat of passion, on reasonable provocation, with malice and premeditation." *Id.* There was no evidence of manslaughter, and hence, even had the complaint been preserved, the refusal of the instruction could not have been error. *State v. Story,* 646 S.W.2d 68, 73 (Mo. banc 1983).

## IV

A fingerprint of the defendant Gray was identified by FBI fingerprint expert Hudson from a campground receipt. Jerry Smith, along with two others, had accompanied Gray on that trip, and his name was on that receipt. The police interviewed Smith about the Keck homicide, and as a result Smith agreed to give evidence for the state in exchange for immunity from prosecution. It was his evidence which most securely implicated Gray and Ballard as the perpetrators of the robbery and homicide.

■ The prosecution introduced the campground receipt and the enlargement of the fingerprint taken from that item to demonstrate the ability of expert Hudson to accomplish the comparison between the Gray prints and those found on a shaving cream can in the Keck house. The defendant argues that the campground receipt and depiction of the fingerprint were irrelevant to any issue on the trial and so should not have been received. It should be noted that the prosecution expert, Hudson, was rigorously cross-examined as to whether the procedure and technique he used to identify the two fingerprints on the shaving cream receptacle found at the Keck house conformed to the methods prescribed

in the FBI primer on that subject. The defense not only contested the method used by Hudson to derive identification, but by its own expert adduced evidence that such an identification could not be made.

The court allowed the exhibits as "merely an aid or tool to assist the jury in understanding the method by which a fingerprinting expert goes about matching fingerprints." The exhibits and evidence were relevant for that purpose. The control of such evidence rests with the discretion of the court, and that discretion was properly exercised. *State v. Crespo*, 664 S.W.2d 548, 552 (Mo.App.1983).

The prosecutor made another use of the testimony. He argued to the jury that "this man, Gary Gray, went on a camping trip, a canoe trip, with Jerry Smith. The campground receipt, the same place they went, contains his fingerprints. It corroborates Jerry Smith." The argument went on to attempt to impeach the opinion of the expert for the defendant—who disagreed with the Hudson opinion that the fingerprints found on the shaving cream can were that of defendant Gray. Indeed, it is error—as the defendant Gray contends—to allow the prosecutor "to argue evidence in a manner contrary to its admission at trial." *See State v. Burnett*, 637 S.W.2d 680, 688[2] (Mo. banc 1982). That facet of argument, although less than a pellucid exposition of the evidence, was not a source of error—and certainly not of prejudice.

The jury could have understood the argument—that the campground receipt "corroborates Jerry Smith"—to mean that the Smith testimony that Gray accompanied him on the trip was confirmed by the presence of the Gray fingerprint on the campground receipt. That evidence, in turn, was relevant to validate the fingerprint comparison technique used by expert Hudson to identify the Gray fingerprints on the shaving cream can found on the Keck premises. The latter part of the argument, albeit somewhat elliptical, attempted to exploit the agreement between the prosecution expert and the defense expert as to the fingerprint found on the campground re-

ceipt to impeach the defense expert. That expert agreed with the opinion of the prosecution witness, an FBI expert, that the fingerprint on the receipt was, indeed, that of the defendant Gary Gray. The defense expert, however, disagreed with the FBI expert that the fingerprints found on the shaving cream can were those of the defendant Gray. It was the sense of the prosecution argument that only the agreement by the defense expert with the opinion of the FBI expert [that the fingerprint on the receipt was that of Gary Gray] could salvage his reputation as an expert, a reputation impaired by his disagreement with the FBI expert as to the identification of the prints found on the shaving cream can. There was no error in the argument of the prosecutor, however attenuated the inference intended. *State v. Newlon*, 627 S.W.2d 606, 616[12–14] (Mo. banc 1982).

V

The defendant argues next that the evidence was not sufficient for submission or conviction. He argues also that the prosecution failed to prove the corpus delicti "insofar as it did not establish that Roy Keck's death was the direct and proximate result of his assault." In assessment of the sufficiency of the evidence, we accept as true all the evidence and inferences in support of the verdict and disregard all the evidence and inferences to the contrary. The question is then "whether the evidence, viewed in the light most favorable to the state, is sufficient to support the verdict." *State v. Brown*, 660 S.W.2d 694, 698 (Mo. banc 1983).

The evidence sufficed for conviction: Jerry Smith was asked by Ballard and Gray on September 9, 1983, to drive them uptown to rob an old man, and was promised $1000. He drove them to a place two blocks from the Keck home, where the defendants got out, and Gray took along a fish filleting knife as he did. When Smith picked them up a short time later, Gray had a billfold and a moneybag. Ballard remarked, "I think we really did it this time," and Gray remarked that he "did not think the old man would be so tough." Keck was found

beaten and semi-conscious at his home on the morning of September 13, 1983, and died in the hospital eleven days later. The fingerprints of the defendant Gray were found on a shaving receptacle in the Keck home. There was medical evidence from the emergency room physician that the puncture wounds, broken cheekbone and other injuries were consistent with a severe beating inflicted several days before Keck was brought to the hospital. The physician who performed the autopsy testified that the death of the victim on September 24 was caused by the trauma to the brain—which compromised the respiratory system—a part of the injury Keck suffered twelve to fourteen days before. The corpus delicti was proven, as was the substantive offense.

The conviction is affirmed.

All concur.