STATE of Missouri, Respondent,

v.

Douglas DAMPIER, Appellant.

No. 18483.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 9, 1993.

John A. Parks, Hermitage, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Defendant, Douglas Dampier, was charged with the class B felony of delivery of more than five grams of marijuana to Kimberly Ford in violation of § 195.211.[1] A jury found Defendant guilty as charged and assessed punishment at five years' imprisonment. The trial court entered judgment per the verdict.

Defendant appeals. His seven points relied on include a claim that the evidence was insufficient to support the verdict, complaints about evidentiary rulings, and an allegation of instructional error.

We begin with point I, which asserts the evidence was insufficient in that it "did not show that Defendant physically delivered marijuana to Kim Ford, or that Defendant had control and knowledge of the marijuana with the intent to deliver it to Kim Ford."

■ In addressing point I, we view the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to the verdict, and disregard contrary evidence and inferences. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991), *cert. denied*, — U.S. —, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Our function is not to weigh the evidence, but to determine whether there was sufficient evidence from which reasonable persons could have found Defendant guilty as charged. *Id.*, 803 S.W.2d at 11.

So viewed, the evidence shows that about three months before March 6, 1991, Corporal James Michael Stewart of the Missouri State Highway Patrol began working "undercover" in narcotics investigations in Dallas County using the pseudonym "J.D. Simpson." He soon became acquainted with Kimberly Ford and Andy Cole. On the afternoon of March 6, 1991, Stewart, Ford and Cole drove in Stewart's vehicle from Cole's apartment in Buffalo to a duplex in Urbana. Ford and Cole were unaware of Stewart's true identity.

1. References to statutes are to RSMo Cum.Supp. 1990 except where otherwise indicated.

They knocked on the door of the north apartment. Defendant answered the door; the trio entered. Several other people were inside.

After a few minutes, Ford and Defendant exited the apartment. A short time later, Defendant returned alone and said, "J.D., I think Kim wants to see you next door."

Stewart walked to the south apartment and entered. Ford was in the living room. She and Stewart went to the "dining room area," where Stewart saw four plastic bags of marijuana and a collapsible, hand-held scale on a kitchen table. Ford weighed the bags on the scale. Stewart and Ford then put the four bags into a larger plastic bag. Stewart paid Ford $275 for the marijuana—a quarter pound. They then exited the apartment.

Stewart locked the marijuana in a tool box in his vehicle. He and Ford then entered the north apartment and remained a few minutes. Defendant asked Stewart when he would be back. Stewart said it would probably be sometime the next week.

At that juncture, Defendant made a comment that is the subject of his sixth point. According to Stewart, Defendant said he "would have some more—." Stewart could not recall Defendant's next word, but remembered it was not "marijuana." Over Defendant's objection, Stewart testified he is familiar with "lingo words . . . within the drug culture, that are synonyms . . . for marijuana." Among them are "pot, smoke, weed." The word Defendant spoke was "a word of similar import to one of those words."

After that remark, Defendant stated "the quality would be better."

Stewart, Ford and Cole then departed. The next day, Stewart took the marijuana to Highway Patrol headquarters for analysis.

Ford, presented as a witness by the State, testified that on March 6, 1991, Defendant was living in the south apartment at the duplex in Urbana. Defendant's niece, a friend of Ford, also lived in that apartment. Ford had been in the apartment on various occasions before March 6, 1991.

Recounting the events of that day, Ford testified that after she, Cole and Stewart arrived and entered the north apartment, she and Defendant went to his apartment. She quoted Defendant as saying marijuana was in a bag on the refrigerator and she could have it, that "it was no good." Ford could not recall whether Defendant handed her the bag or she "grabbed it."

Defendant departed. Ford put the bag on the table and removed the marijuana. Asked about the scales, Ford testified, "I believe they were in the bag."

Stewart entered the apartment, and he and Ford "looked at the pot." Stewart offered Ford $275. Ford weighed the marijuana, then gave it to Stewart and he gave her $275. Asked what she did with the money, Ford answered, "I took half of it and put it in my pocket and left the other half on the table." Ford admitted she had no agreement with Defendant to share the money.

A warrant was eventually issued for Defendant's arrest. Dallas County Sheriff Jerry Cox, accompanied by Deputy Sheriff Melvin Parks, executed the warrant. Parks read Defendant the "Miranda warning."[2] Details about this appear *infra* in our discussion of point VII. Cox, who had been trying to contact Defendant for several weeks, asked Defendant why he had not contacted him (Cox). According to Cox, Defendant replied that he knew Cox would arrest him. Cox's testimony continued:

Q. . . . And what other conversation did you have . . . with Doug Dampier?

. . . .

A. I believe I asked him why that he had had this marijuana, why he had sold it.

. . . .

Q. . . . And what was his response to that question?

A. He said he had picked the stuff while he was in Nebraska while he was working for Steve Hart with a dump truck; and that times could get hard, and he needed to pay the rent.

David Nanneman, a chemist at the Missouri State Highway Patrol laboratory,

---

**2.** The ritual ordained by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

weighed the marijuana Ford sold Stewart. Nanneman determined there were 104.8 grams of "plant material," which consisted of "about 60 to 75 percent seeds." During trial, outside the presence of the jury, Nanneman did some additional weighing of the marijuana. We shall set forth his findings *infra* when we reach Defendant's point V.

■ Defendant's first point begins with the premise that he did not have possession of the marijuana in his apartment on March 6, 1991. Defendant asserts, "Delivery requires a transfer of possession from one person to another." Defendant argues that inasmuch as he did not have possession of the marijuana, he could not deliver it to Ford.

In support of his theory, Defendant emphasizes he shared his apartment with his niece. Furthermore, says Defendant, several other persons had access to the apartment, including Ford.

Defendant relies on *State v. Falkner*, 672 S.W.2d 373 (Mo.App.W.D.1984), but its facts are too different for it to apply. In *Falkner*, officers obtained a warrant to search a three-story residence owned by the accused. Upon entering, the officers encountered the accused and one Strong in the living room on the ground floor. Marijuana was found in two purses in a second floor bedroom. Marijuana was also found in a paper bag in another second floor bedroom. A trace of heroin and a trace of cocaine were found in the kitchen on the first floor. The accused was found guilty of possession of the marijuana, heroin and cocaine. On appeal, the Western District of this Court held the evidence sufficient to show the accused and Strong shared control of the premises. *Id.* at 376. However, there was no evidence, direct or circumstantial, that the accused had knowledge of the presence and character of the contraband .and was intentionally and consciously in possession of it. *Id.* The judgment was reversed outright.

The facts here are strikingly different. Defendant knew the bag on the refrigerator contained marijuana. Indeed, he was familiar enough with it to have formed the opinion it was "no good." He exercised dominion over it by telling Ford she could have it. Defendant's guilty knowledge is further revealed by his remark to Stewart that he (Defendant) would have more the following week and its quality would be better.

Two definitions in the Comprehensive Drug Control Act of 1989 apply. Section 195.010(10) reads:

> "Deliver" or "delivery", the actual, constructive, or attempted transfer from one person to another ... of a controlled substance....

Section 195.010(33) reads:

> "Possessed" or "possessing a controlled substance", a person, with the knowledge of the presence and illegal nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it....

Judicial application of the concept of constructive possession is shown by *State v. Hughes*, 702 S.W.2d 864 (Mo.App.W.D.1985), where the accused was convicted of possessing an untagged deer. The deer was concealed in a pickup owned by the accused's hunting companion, one Perdue. The accused was not in the pickup when the conservation agent discovered the deer. On appeal, the accused argued there was no evidence that he was in possession of the deer. *Id.* at 866. Affirming the conviction, the Western District of this Court held:

> Constructive possession is attributed to a "person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons...." It was undisputed that the deer was shot by and belonged to [the accused]. Pursuant to [his] request, the deer was placed in Perdue's truck—the vehicle in which [the accused] was also traveling. Perdue took no action inimical to [the accused's] interest in the deer, but

rather, in retrieving the deer for [the accused], he acted to preserve [the accused's] interest. There is no claim that [the accused] had renounced his interest in the deer and all of the evidence was consistent with the view that [the accused] continued to exercise control over the deer through Perdue.

*Id.* at 867 (citation omitted).

Here, Defendant admitted to Sheriff Cox that he (Defendant) had picked the marijuana in Nebraska. As we have seen, when Defendant and Ford entered Defendant's apartment on the afternoon of March 6, 1991, the marijuana was in a bag on the refrigerator. Defendant knew the marijuana was in the bag, and was familiar with its quality. Defendant exercised dominion over the marijuana by telling Ford she could have it. We hold these facts sufficient to support a finding that Defendant had constructive possession of the marijuana.

Do these facts also support a finding of delivery of the marijuana by Defendant to Ford? We say yes. In *State v. Gordon,* 536 S.W.2d 811 (Mo.App.1976), the accused was convicted of distributing controlled substances in violation of the 1973 version of the Narcotic Drug Act. Distributing, as statutorily defined, was "to deliver other than by administering or dispensing." *Id.* at 815–16. Deliver was statutorily defined as it is today in § 195.010(10), quoted *supra.* 536 S.W.2d at 816. The appellate court held the mere surrender of possession was sufficient to constitute delivery. *Id.*

Here, Defendant either handed the bag of marijuana to Ford or she grabbed it. Either way, Defendant surrendered possession of the marijuana to Ford by telling her she could have it and by acquiescing when she took it in hand. Defendant's first point is denied.

■ We next address Defendant's point VI, which avers the trial court erred in allowing Stewart to testify that a word uttered by Defendant on March 6, 1991 (which Stewart could not remember) was a synonym for marijuana. The way this issue arose at trial

is recounted earlier in our summary of Stewart's testimony.

Defendant relies on one case, *State v. Gray,* 731 S.W.2d 275 (Mo.App.W.D.1987). It recites the general rule that a witness must state facts from which the jurors form the opinion. *Id.* at 284[6]. However, *Gray* goes on to hold it was not error to receive testimony by a witness that as he watched a news report about a robbery, he looked at the accused and "knew by the look on his face what had happened." *Id.* at 284–85.

Here, the dialogue between Defendant and Stewart which gives rise to Defendant's sixth point occurred as Stewart was departing after buying the marijuana from Ford. Defendant asked Stewart when he would be back, and Stewart replied it would probably be sometime the next week. Defendant's next words—that he "would have some more"— were followed by a noun, but Stewart could not recall the noun. However, Stewart did remember it was a synonym in the drug culture for marijuana. As explained below, we find no basis for reversal in the trial court allowing Stewart to so testify.

Before the parting colloquy between Defendant and Stewart, the only words between them consisted of Defendant's message to Stewart that Ford wanted to see him in Defendant's apartment. Defendant delivered that message when he returned to the north apartment from his apartment, where he had just told Ford she could have the marijuana in the bag on the refrigerator.

As there was no evidence of any other dialogue between Defendant and Stewart until after Stewart bought the marijuana, the jury could have reasonably inferred the forgotten word was a synonym for marijuana even without Stewart so testifying. Furthermore, any arguable error in allowing Stewart to so testify was immediately cured when he testified Defendant next said "the quality would be better." That remark, coupled with Ford's testimony that Defendant had earlier said the marijuana was "no good," make it unmistakably clear that Defendant's reference to "some more" meant some more marijuana. Defendant's sixth point is meritless.[3]

3. Defendant's sixth point makes an oblique reference to testimony by Stewart regarding some-

During trial, the prosecutor asked permission to endorse Dwight Nyberg as a State's witness on the information and to present testimony by him. Over Defendant's objection, the trial court granted the request. Defendant's point IV maintains this was error.

The perceived need for witness Nyberg arose during testimony by chemist Nanneman, who weighed the marijuana before trial and, as noted earlier, determined there were 104.8 grams of "plant material," the greater part of which consisted of seeds. When questions by Defendant's lawyer revealed Nanneman had not removed the seeds and weighed the remaining marijuana, the prosecutor excused Nanneman from the witness stand and presented other witnesses. While they were testifying, Nanneman went to a pharmacy operated by Nyberg and, using Nyberg's scales, weighed part of the marijuana after removing the seeds.[4] The details of Nanneman's efforts are reported *infra*.

Nyberg, a licensed pharmacist in Missouri since 1974, testified he has a set of scales which are checked from time to time by the Missouri Division of Weights and Measures and the Missouri Board of Pharmacy. The most recent test by the latter agency was seven years before trial. Officials checking the scales bring their own weights and check those against Nyberg's weights. Nyberg observed no damage, chips or nicks in any of his weights during the seven years since they were last inspected. According to Nyberg, his scales had never malfunctioned in the past fifteen years. When Nyberg weighs a substance, he "bring[s] the scales to zero."

Nyberg testified he calibrated his scales by "zeroing them out," then watched while Nanneman used the scales to weigh a portion of the marijuana after removal of seeds. Nyberg observed the weight to be 5.7 grams.

Defendant asserts it was reversible error to allow Nyberg to testify because Defendant was not informed about Nyberg "until midway in the trial thereby prejudicing Defendant in his preparation for trial and diminishing his ability to meet the evidentiary issues added as a result of this witness' testimony."

The trial court is allowed wide discretion in permitting witnesses to testify where endorsement has been late or where the witness is unendorsed. *State v. Gilmore*, 797 S.W.2d 802, 807[7] (Mo.App.W.D.1990); *State v. Lamphier*, 745 S.W.2d 166, 170 (Mo.App. W.D.1987). In determining whether the trial court erred in allowing such a witness to testify, a reviewing court considers these factors: (1) whether the accused waived the objection, (2) whether the State intended surprise or in bad faith intended to deceive or disadvantage the accused, (3) whether the accused was in fact so deceived or disadvantaged, and (4) whether the type of testimony given might readily have been contemplated. *Gilmore*, 797 S.W.2d at 807–08[8]; *State v. Renner*, 675 S.W.2d 463, 464–65[3] (Mo.App. E.D.1984).

Defendant's objection to the State's use of Nyberg as a witness has been carefully preserved for appellate review (factor 1). However, Defendant concedes the prosecutor did not act in bad faith or with intent to deceive or disadvantage Defendant (factor 2). As to prejudice (factor 3), Defendant argues he had to raise objections about the qualifications of a witness whom he had no way of knowing would testify, and he had to attempt to raise proper objections on matters outside his trial

---

thing Defendant said approximately one week after March 6, 1991. However, neither the point nor the argument following it supplies enough of a clue for us to identify the testimony about which Defendant apparently wishes to complain. We seined the statement of facts in quest of a hint, but discovered none.

4. Inferably, the reason Nanneman removed the seeds, then weighed the marijuana, is found in the statutory definition of marijuana, § 195.-010(26), which reads:

"**Marijuana**", all part of the plant genus Cannabis in any species or form thereof . . .

whether growing or not, the seeds thereof, the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination[.]

preparation. However, Defendant does not identify any specific objection he was obliged to make (or should have made but didn't), nor does Defendant identify any matter that was outside his trial preparation.

We have studied Nyberg's testimony and have found nothing to suggest Defendant was placed at a disadvantage. Nyberg was a witness only because Nanneman needed scales to weigh the marijuana during trial. The scales used by Nanneman are those Nyberg uses in his profession as a pharmacist. The prosecutor did not present Nyberg as an expert on scales, hence there were no technical aspects of his testimony for which Defendant's lawyer needed to prepare.

Finally, it could have been readily expected that the prosecutor would present testimony of some sort regarding the means by which the weight of the marijuana was determined (factor 4).

Considering the above four factors and the benign character of Nyberg's testimony, we hold the trial court did not err in permitting the prosecutor to endorse him as a witness and present his testimony. Defendant's fourth point is denied.

Before addressing Defendant's point V, we summarize Nanneman's testimony regarding his use of Nyberg's scales. From one of the four bags of marijuana Ford sold Stewart, Nanneman removed less than half the contents. From the portion he removed, Nanneman separated the seeds and the "plant material." He then weighed the "leafy material" on Nyberg's scales and determined it weighed 5.7 grams. Nanneman examined the contents of all four bags and formed the opinion that the contents "were uniform in terms of leafy material versus seeds."

Defendant's fifth point asserts the trial court erred in receiving evidence that the portion of the marijuana from which the seeds had been removed weighed 5.7 grams on Nyberg's scales. The point declares: "[T]here was an insufficient factual basis for Nyberg to express an opinion of the accuracy of his scales, whether they were properly functioning, or if the weights used with the scales were of a known weight; and because

... Nyberg was not qualified as an expert to express an opinion on these matters."

Defendant's notion that Nyberg was allowed to "express an opinion" on the accuracy of his scales is a misconception of Nyberg's testimony. He merely identified the agencies which check his scales, described the frequency (or infrequency) that this is done, and related that he had observed no damage, chips or nicks in any of his weights since the last inspection. His only other remark about the scales was his comment that to his knowledge, they had not malfunctioned in the past fifteen years.

The three cases on which Defendant relies concern testimony markedly different from Nyberg's. Those cases are: *State v. Johnson*, 504 S.W.2d 334 (Mo.App.1973), opinion by coroner on cause of death; *State v. Woolford*, 545 S.W.2d 367 (Mo.App.1976), opinion by firearms expert that rifle was fired intentionally and did not discharge accidentally; *State v. Schmidt*, 530 S.W.2d 424 (Mo.App. 1975), opinion by auditor regarding indebtedness purportedly revealed by bank records spanning some three and a half months.

Neither side cites a case where the weight of a substance was an element of the crime and the accuracy of the weighing device was an issue. Surprisingly, we find no Missouri case on the subject.

In *State v. Smith*, 187 Neb. 152, 187 N.W.2d 753 (1971), the accused was convicted of unlawful possession of one-half pound or more of cannabis. A chemist employed by the State was allowed to testify, over objection, that he weighed the substance on a scale in the laboratory and it weighed seven pounds, four ounces. On appeal, the accused contended the foundation for this testimony was inadequate because it was not shown that the scale had been tested and found accurate.

Evidently, the Supreme Court of Nebraska could find no applicable authority. Without citing a case, the Court held the ruling was within the discretion of the trial court, and affirmed the conviction. 187 N.W.2d at 755[1].

In a New York case, *People v. Matessino*, 15 Misc.2d 7, 179 N.Y.S.2d 911 (1958), the

accused was convicted of operating a truck having a weight in excess of the statutory limit. On appeal, he challenged the competency of the proof regarding accuracy of the scales used in weighing his truck. The scales had last been tested three and a half months before the date of the alleged offense. The test showed the scales were accurate within a tolerance of three percent. The court held:

> Manifestly, it would be impractical, if not impossible, to maintain under a constant, day by day, test the correctness of any measuring device. Many instruments in daily use, such as watches, thermometers, and personal scales, are taken for granted, and as Wigmore says: "only when a disputed issue turns upon minute accuracy would their correctness need to be verified" (Wigmore, Science of Judicial Proof, 3d Ed., sec. 220).

179 N.Y.S.2d at 914.

In *Matessino*, the overload was nearly 35 percent above the allowable limit, and there was no evidence of damage to the scales since the last test. The conviction was affirmed.

Here, Nyberg's scales had been used by him in the practice of his profession of pharmacy for at least fifteen years, and he had observed no malfunction during that time. When last checked by a state agency, seven years before trial, the scales passed inspection. Nyberg had noticed no damage to any of his weights since the inspection.

Furthermore, proof of the crime charged did not hinge on minute accuracy. Delivery of the marijuana was a class B felony if it weighed more than five grams. It will be remembered that Nanneman removed less than half the marijuana from one of the four bags. From the portion he removed, which was no more than one-eighth of the entire amount, Nanneman separated the seeds from the plant material. The leafy material weighed 5.7 grams on Nyberg's scales.

From Nanneman's testimony that the contents of all four bags were uniform in ratio of seeds to leafy material, the jury could have reasonably found the aggregate leafy material in the four bags—minus seeds—weighed

in excess of forty grams. There was no evidence supporting any other conclusion. Consequently, this case did not hinge on meticulously precise weight.

The trial court is vested with substantial discretion in ruling on admissibility of evidence. *Gant v. Hanks*, 614 S.W.2d 740, 744[3] (Mo.App.E.D.1981). Admissibility of questionable evidence is within the sound discretion of the trial court. *Compton v. Williams Bros. Pipeline Co.*, 499 S.W.2d 795, 797 (Mo.1973). As did the Supreme Court of Nebraska in *Smith*, 187 Neb. 152, 187 N.W.2d at 755[1], we hold the admissibility of the weight of the leafy material shown by Nyberg's scales was within the discretion of the trial court, and consistent with the rationale of *Matessino*, 15 Misc.2d 7, 179 N.Y.S.2d at 914, we hold the trial court did not abuse its discretion in receiving such evidence. Defendant's fifth point is without merit.

By point III, Defendant argues the trial court erred in failing to instruct the jury on "the lesser offence of delivery of five grams or less of marijuana."

We have carefully studied the instruction conference, Rule 28.02(e),[5] as recorded in the transcript, and have found no request by Defendant for such an instruction. Nowhere in his brief does Defendant state he tendered one.

Except in homicide cases, an accused may not complain on appeal about a trial court's failure to give a lesser-offense instruction unless the accused requests it specifically. *State v. Olson*, 636 S.W.2d 318, 322–23[9] (Mo. banc 1982). Furthermore, Rule 30.06(e) provides that if a point on appeal relates to the refusal of an instruction, such instruction shall be set forth in full in the argument portion of the brief. Defendant's brief sets forth no instruction on delivery of not more than five grams of marijuana. This precludes appellate review of his third point. *State v. Williams*, 674 S.W.2d 46, 48[5] (Mo.App.E.D.1984); *State v. Swink*, 620 S.W.2d 63, 64[1] (Mo.App.E.D.1981).

Even so, in appropriate cases we may grant plain error review. However, for

---

5. Rule references are to Missouri Rules of Criminal Procedure (1992).

instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice. *State v. Parkus*, 753 S.W.2d 881, 887–88[13] (Mo. banc 1988), *cert. denied*, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988).

 No such circumstances exist here. A trial court is required to submit an instruction on a lesser-included offense only where there is some affirmative evidence of the lack of an essential element of the higher offense which would not only authorize acquittal of the higher offense but sustain a conviction of the lesser. *Olson*, 636 S.W.2d at 322[6]; *State v. Childers*, 801 S.W.2d 442, 446[9] (Mo.App.E.D.1990).

 Here, nothing in the evidence suggests that after Nanneman removed the seeds, the leafy material he weighed on Nyberg's scales contained anything that failed to satisfy the statutory definition of marijuana.[6]

The case on which Defendant relies, *State v. Hyzer*, 811 S.W.2d 475 (Mo.App.S.D.1991), does not aid him. There, the accused was convicted of selling more than five grams of marijuana, a class B felony. What he sold weighed 5.47 grams in toto. The person who weighed it conceded it contained seeds which may have been incapable of germination, and had such seeds been excluded he could not swear the remainder would have exceeded five grams. If it did not, the crime was only a class C felony.

As observed earlier, the evidence in the instant case regarding the weight of the leafy material in the four bags was that it exceeded forty grams. There was no contrary evidence. Therefore, we hold the trial court's failure to instruct the jury on delivery of not more than five grams of marijuana did not cause manifest injustice or a miscarriage of justice.

Defendant's point II assigns error in the admission of rebuttal evidence presented by the State.

The stage was set for this issue when Defendant testified he was unaware there was marijuana in his apartment when he talked to Ford there on the afternoon of March 6, 1991. Defendant avowed he had no conversation with Ford about marijuana. Defendant denied selling marijuana to pay his rent, denied telling Sheriff Cox he did so, and denied finding any money on the table in his apartment after Ford departed.

On cross-examination, Defendant testified he never had marijuana or scales in his apartment. His lawyer registered no objection to that line of inquiry.

In rebuttal, over Defendant's objection that it was "evidence of another crime," the prosecutor elicited testimony from Stewart that he was in Defendant's apartment about a week after March 6, 1991, and saw a bag of marijuana. Then, this:

Q. Did you have a conversation with Doug Dampier concerning that marijuana that you saw?

A. ... he stated that they had stored it somewhere and some mice had got into it, and they had eaten a hole through the sack, and there was also mice droppings in it, and they had eaten on the stems. He said, ... "I just accidently [sic] messed up, and it got ruined." ... He brought it out and showed it to me. He opened it up and showed it to me.

Defendant's point II asserts the trial court erred in admitting the above testimony in that it constituted evidence of "another crime in the form of specific instances of unconvicted conduct occurring after the crime being tried, and was not admissible for impeachment because [the] State is not permitted to prove by extrinsic proof, collateral matters first inquired into on cross-examination, but is bound by the answers therein given."

We first address Defendant's contention that Stewart's testimony was inadmissible in that it constituted extrinsic proof of a collateral matter, hence the State was bound by Defendant's answers on cross-examination. Defendant registered no such objection at trial, and did not set forth that theory of error in his motion for new trial.

6. Section 195.010(26), footnote 4, *supra*.

A point on appeal regarding admissibility of evidence must be based on the theory of the objection made at trial. *State v. Lang*, 515 S.W.2d 507, 511[8] (Mo.1974). That is, an accused is not permitted on appeal to broaden the objection he presented to the trial court; he may not rely on a theory different than the one offered at trial. *State v. Bostic*, 789 S.W.2d 804, 807[1] (Mo.App. W.D.1990); *State v. Clark*, 759 S.W.2d 372, 374[4] (Mo.App.E.D.1988). Furthermore, as the above theory of error was not raised in Defendant's motion for new trial, it is not reviewable on appeal. *State v. Harris*, 620 S.W.2d 349, 354[7] (Mo. banc 1981).

We therefore confine our consideration of point II to Defendant's complaint that Stewart's testimony constituted evidence of another crime, and was consequently inadmissible.

In *State v. Green*, 674 S.W.2d 615 (Mo. App.E.D.1984), the accused was convicted of assault in the first degree by means of a dangerous instrument. At trial, he testified on direct examination that he did not have a weapon and had never had drugs in his home. In rebuttal, the prosecutor introduced a search warrant inventory for the accused's home listing three bottles containing a substance believed to be marijuana, numerous capsules and pills, and three firearms. On appeal, the accused argued it was reversible error to admit the rebuttal evidence. The Eastern District of this Court denied the claim, holding the accused had opened the door to the rebuttal evidence. *Id.* at 621[15]. The opinion stated, "The precise scope of this rebuttal evidence is within the trial court's discretion, and we find the court did not abuse this discretion in admitting the [evidence] in question." *Id.* at 621[16].

The only difference between *Green* and the instant case is that in *Green*, the rebuttal evidence contradicted testimony by the accused on *direct examination*, while here the rebuttal evidence contradicted testimony by Defendant on *cross-examination*.

In *State v. Coats*, 835 S.W.2d 430 (Mo.App. E.D.1992), the accused was convicted of assault in the first degree. At trial, he testified on direct examination that he was knocked down by the victim's car and that the victim hit him in the face with fists and kicked him. On cross-examination, the accused testified he needed no medical attention. During re-cross-examination, the accused testified he asked the police for medical treatment. In rebuttal, the trial court allowed the prosecutor to present evidence as to whether the accused had requested medical treatment. Reviewing for plain error, the Eastern District of this Court held that because of the accused's self-contradictory testimony, admission of the rebuttal testimony did not constitute plain error. *Id.* at 434[8].

Here, Defendant did not object when the prosecutor, on cross-examination, asked whether he had ever had marijuana or scales in his apartment. Defendant answered no, and thereby received the benefit of those answers.

Competent testimony which tends to counteract, repel or disprove evidence offered by the accused may be offered in rebuttal. *State v. Hyatt*, 716 S.W.2d 423, 425[3] (Mo. App.W.D.1986); *State v. Martin*, 651 S.W.2d 645, 652–53[10] (Mo.App.S.D.1983). Stewart's testimony in rebuttal directly contradicted Defendant's testimony that he had never had marijuana in his apartment. Given the broad discretion with which the trial court is vested in determining the scope of rebuttal testimony, *Martin*, 651 S.W.2d at 652–53[9], we cannot convict the trial court of reversible error in receiving Stewart's testimony.

We do not overlook *State v. Carothers*, 710 S.W.2d 370 (Mo.App.E.D.1986), cited by Defendant. There, the accused was convicted of murder in the second degree. He raised the defense of involuntary intoxication, testifying he had smoked the drug PCP. On cross-examination, the prosecutor was permitted to inquire about the accused's arrest in another state for possession of PCP. Declaring the inquiry entirely unrelated to the issue whether the accused ingested PCP on the date of the murder, the Eastern District held the trial court erred in allowing the inquiry.

The difference between *Carothers* and the instant case is obvious. In *Carothers*, the

inquiry produced answers which did not contradict any testimony the accused had given. There was no issue about his knowledge of PCP. Here, Stewart's testimony directly contradicted Defendant's testimony that he had never had marijuana in his apartment. *Carothers* does not address such a situation.

The only remaining point is point VII, which assigns error in the trial court's refusal to allow Defendant to present his sister-in-law, Beverly, as a witness at a hearing on a motion by Defendant to suppress his statements to Sheriff Cox. The hearing was held immediately before trial, while the venire waited outside the courtroom. Before anyone testified, the prosecutor asked Defendant's lawyer, "[D]o you want the rule on witnesses to refer to the motion to suppress?" Defendant's lawyer answered, "Yes, please."

Defendant then testified. After Defendant's testimony, his lawyer called Beverly to the witness stand. The prosecutor objected because Beverly had been in the courtroom during Defendant's testimony. The trial court sustained the objection, telling Defendant's lawyer he invoked the "rule" and the prosecutor excluded his witnesses, therefore Beverly could not testify.

Defendant argues in point VII that the trial court "had not in fact ordered the rule on witnesses." Therefore, says Defendant, the trial court's refusal to allow Beverly to testify denied Defendant his right to call a witness on his behalf.

In our examination of the transcript, we have discovered no offer of proof regarding the testimony Defendant expected to adduce from Beverly. When a prospective witness is precluded from testifying, the proper procedure is for the party protesting such exclusion to preserve the anticipated evidence by an offer of proof in the form of questions and answers, or a summation by counsel of the proposed testimony, which should also demonstrate why such testimony was admissible. *State v. Lopez,* 836 S.W.2d 28, 33[11] (Mo.App.E.D.1992); *State v. Forshee,* 723 S.W.2d 480, 482[2] (Mo.App.S.D. 1986). Because Defendant did not do so here, he has failed to preserve the issue for appellate review. *State v. Schneider,* 736 S.W.2d 392, 401[7] (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988).

Furthermore, we fail to see how Beverly could have supplied any testimony beneficial to Defendant on the suppression issue. Defendant's brief does not enlighten us.

Defendant testified the Miranda warnings were read to him "probably four miles south of Louisburg, after they had handcuffed me and hauled me off." According to Defendant, this was immediately after he told Sheriff Cox, "A man's got to pay his rent."

Both Sheriff Cox and Deputy Sheriff Parks testified the Miranda warnings were given in the patrol car before Defendant said anything about marijuana. Beverly was not in the car, hence she could not have testified whether the Miranda warnings preceded or followed Defendant's incriminatory statements. That being so, we need not decide whether the trial court erred in barring Beverly from testifying, as only prejudicial error requires reversal of a conviction. *State v. Kurtz,* 564 S.W.2d 856, 861[12] (Mo. banc 1978).

Judgment affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.