

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD85685 |
| | ) | |
| NANCY SANDER, | ) | Filed: December 26, 2023 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Vernon County
The Honorable James Kelso Journey, Judge**

**Before Division Two: Janet Sutton, P.J., and
Alok Ahuja and Mark D. Pfeiffer, JJ.**

Nancy Sander was convicted of first-degree murder following a jury trial in the Circuit Court of Vernon County. Her conviction arose from an incident in September 2018 in Osceola, in which Sander's ex-husband shot and killed Sander's son-in-law, and then killed himself. Sander was convicted of first-degree murder on an accomplice liability theory. She appeals, arguing that the evidence was insufficient to convict her; that the circuit court committed instructional error; and that the court erred in overruling her objections to the State's evidence and closing argument. We affirm.

## Factual Background

On September 7, 2018, Charles Sander shot and killed the Victim, an adult male, at a convenience store in Osceola; Charles[1] then shot and killed himself.

The defendant, Nancy Sander, had previously been married to Charles. They had a daughter, Elizabeth Kilgore. Kilgore married the Victim in 2014, and they had a son together.

The Victim and Kilgore separated in July 2017. During the couple's dissolution-of-marriage case, Kilgore alleged that the Victim had abused her and their son. After the divorce, Kilgore and the Victim shared custody of their son. They would conduct custody exchanges at a convenience store in Osceola approximately fifteen minutes from where Kilgore lived with Sander. Sander regularly attended these custody exchanges. Charles lived in Twin Bridges, approximately three hours from Sander's home and from the convenience store where the shooting occurred.

On September 6, 2018 – the day before the Victim's murder – Kilgore called Charles, and the two spoke for approximately ten minutes. Charles subsequently called one of his neighbors and informed him that he was going to the home which Sander and Kilgore shared. The neighbor testified that Charles "sounded like he'd been maybe upset or crying or something" and "seemed off." Charles "made the comment how, I don't know if I'll be back."

Early the next morning, Sander drove with Charles to the custody exchange in Osceola. Video footage from several security cameras at the convenience store was introduced in evidence at trial, and depicts what transpired. The video

---

[1] Because Charles and Nancy Sander share a surname, we refer to Charles by his first name for ease of reference.

reflects that Sander exited the vehicle and went inside the convenience store to purchase a beverage. She returned to the vehicle, and stood next to the passenger door where Charles was seated, apparently speaking to him. When the Victim arrived, Sander stood outside the store and spoke with him. At one point, Sander moved from the Victim's right side to his left side, causing him to turn his body to continue their conversation. Because he turned, the Victim had his back to the vehicle where Charles was seated, while Sander was facing it. Thus, while Sander would have been able to see Charles exit the vehicle and approach, the Victim would not.

Charles approached where Sander and the Victim were talking. As he did so, Sander began to move away. Charles initially shot the Victim at least once, and he and the Victim engaged in a physical struggle. As the Victim fell to the ground, Charles shot the Victim multiple additional times. The evidence at trial indicated that the Victim had been shot a total of seven times. He died from his wounds.

After shooting the Victim, Charles walked to the side of the building and shot and killed himself.

On the video, it appears that Sander may have flinched, or braced herself, immediately before the Victim reacted to being shot for the first time. She continued to distance herself, at a walking pace and without looking back, as the struggle continued. Sander went into the convenience store and reported to the clerk that "he'd been shot," although from the video it did not appear that she had actually seen what had happened. An employee at the convenience store testified that Sander's demeanor was "frantic" at first, but that after she entered the store,

3

"[s]he seemed to calm quite a bit and got kind of cold." It appeared that Sander stared directly into a security camera behind the cash register after she reported the shooting.

Sander gave the police her cellular phone, and her consent to search its contents. Police extracted the phone's data. The data on the phone reflected that, in the two months before the murder, the phone had been used to search degrees of homicide in Missouri; the definition of manslaughter and second-degree murder; how to cause a fatal caffeine overdose; how to hide a child who has been abused; and parental kidnapping. The officer who extracted the data did not recall whether he need to use a password to access the phone.

A police officer spoke with Sander on the morning of September 7. Sander told the officer that she had gone inside the convenience store to get a drink, and falsely stated that she was still inside the store when the first shots were fired.

On September 12, 2018, Sander returned to the convenience store. A police officer observed her outside, staring at the top of the building where security cameras would be mounted. The officer testified that Sander "kind of glanced my way, and then, all of a sudden, [was] looking for stuff in the car." As the officer entered the convenience store, Sander began looking up again. Sander's behavior was sufficiently noteworthy that the officer recorded and checked the license plate number of her vehicle to determine Sander's identity.

A convenience store employee who interacted with Sander on September 12 testified that her demeanor "seemed happy."

Prior to the shooting, Kilgore worked as a jailer at the St. Clair County Detention Center. Evidence at trial indicated that she had attempted to persuade

another jail employee, and two inmates, to kill the Victim because of their ongoing custody disputes. Kilgore's employment at the jail had been terminated due to those conversations, and her improper fraternization with inmates. The gun Charles used to shoot the Victim had been purchased by the Victim, and was associated with Kilgore. Kilgore was separately convicted of first-degree murder in connection with the Victim's death. *See State v. Kilgore*, No. 18SR-CR00437 (Cir. Ct. of Henry County); *State v. Kilgore*, No. WD84526, 654 S.W.3d 915 (Mo. App. W.D. Nov. 15, 2022) (unpublished order affirming Kilgore's conviction on direct appeal).

Sander was charged with the first-degree murder of the Victim on the theory that she aided and encouraged Charles' shooting of the Victim. The case was tried by a jury on July 18-20, 2022. The only verdict director submitted to the jury was for murder in the first degree; the jury was not instructed on any lesser-included offenses. The circuit court discussed the possibility of submitting lesser-included offense instructions with counsel on the record, but Sander's counsel stated that he did not believe any lesser offenses were applicable given the nature of the State's evidence.

The jury found Sander guilty as charged. She was sentenced by the court to life imprisonment without the possibility of parole.

Sander appeals.

## Discussion

Sander raises five Points on appeal. She argues that the evidence was insufficient to convict her; that the court erred in failing to instruct the jury on

any lesser-included offenses; and that the court erred in overruling her evidentiary objections, and objections to the State's closing argument.

### I.

Sander's first Point argues that the evidence at trial was insufficient to sustain her conviction of first-degree murder.

"Appellate review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from a which a reasonable [fact finder] could have found the defendant guilty beyond a reasonable doubt." *State v. Emmanuel*, 667 S.W.3d 664, 671 (Mo. App. W.D. 2023) (citation and internal quotation marks omitted). We give great deference to the fact finder's ability to determine the credibility of witnesses, weigh the evidence, and resolve conflicts in testimony, and we will not re-weigh the evidence. *Id.* "'All evidence and inferences favorable to the State are accepted as true, and all evidence and inferences to the contrary are rejected.'" *State v. Gibbons*, 629 S.W.3d 60, 92 (Mo. App. W.D. 2021) (quoting *State v. Porter*, 439 S.W.3d 208, 211 (Mo. 2014)). This standard applies even where evidence of guilt is circumstantial. *State v. Martin*, 291 S.W.3d 269, 275 (Mo. App. S.D. 2009).

"A person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter." § 565.020.1.[2] "Deliberation" is defined as "cool reflection for any length of time no matter how brief." § 565.002(5). "[D]eliberation may be inferred from the circumstances surrounding the crime, and such an inference is supported by a lack of concern for and a failure to attempt to aid the victim."

[2]	Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, as updated by the 2018 Cumulative Supplement.

*State v. Alexander*, 505 S.W.3d 384, 393 (Mo. App. E.D. 2016). If committed by an adult, murder in the first degree is a class A felony that carries a punishment of either death or life imprisonment without eligibility for parole. § 565.020.2.

Where a defendant is tried for first-degree murder under a theory of accomplice liability, the State makes a submissible case "if it introduces evidence from which a reasonable juror could have concluded beyond a reasonable doubt that, (1) the defendant committed acts which aided another in killing the victim; (2) it was the defendant's conscious purpose in committing those acts that the victim be killed; and (3) the defendant committed the acts after he personally deliberated on the victim's death." *State v. McBenge*, 507 S.W.3d 94, 106 (Mo. App. E.D. 2016) (citing *State v. O'Brien*, 857 S.W.2d 212, 216-18 (Mo. 1993)). The defendant does not need to have personally performed each act constituting the elements of the crime, but must have "acted together with or aided the other person either before or during the commission of the murder with the purpose of promoting the crime." *Id.*

Viewing the evidence, and all reasonable inferences from that evidence, in the light most favorable to the verdict, there was sufficient evidence to find that Sander committed first-degree murder under an accomplice liability theory. It is undisputed that Charles shot and killed the Victim. There is evidence from which a jury could conclude that Sander aided him in doing so. She drove Charles to the scene of the crime, and appeared to be speaking to Charles immediately before walking over to where she encountered the Victim in front of the convenience store. While standing and talking to the Victim, a jury could conclude that she moved so that the Victim's back would be to Charles as he approached. Sander

7

then moved away from the Victim as Charles approached, to distance herself from Charles' impending attack. The video recording also appears to show Sander flinching or bracing herself before the Victim reacts to the first gunshot. Sander then walked away, without looking back, as the attack progressed, and told individuals in the convenience store that "he'd been shot." Although she initially appeared "frantic," Sander was later calm, and appear to stare at a security camera behind the cash register. A jury could find Sander's behavior to be unusual immediately following a violent murder-suicide to which she was in such close physical, and familial, proximity.

Sander lied to a police officer shortly after the shooting, telling him that she had been inside the store when the shooting occurred, which the jury could interpret as an effort to exculpate herself from involvement in the crime. "Consciousness of guilt can be inferred by false statements made in an attempt to deceive the police." *State v. Ryan*, 576 S.W.3d 326, 333 (Mo. App. S.D. 2019) (citation omitted).

Days later, Sander was observed staring at the outside security cameras which recorded the shooting, and trying to conceal what she was doing from a police officer. Although her son-in-law had just been murdered by her ex-husband while she was only a few feet away, Sander "seemed happy."

A jury could also reasonably infer that Sander had the opportunity to plan the murder with Charles, both as he stayed overnight in her home before the murder, and as they drove to the murder scene in the morning.

Besides her movements at the convenience store which facilitated the Victim's murder, the internet searches conducted on Sander's phone support the

8

inference that she had deliberated on the Victim's murder for months before his killing, and wished for him to be dead.  Those searches included researching the degrees of homicide, and the definitions of different homicide-related offenses, under Missouri law; whether an individual could be killed with powdered caffeine; parental kidnapping; and how to hide a child who has been abused.

Viewed in the light most favorable to the verdict, there was sufficient evidence from which the jury could have found Sander guilty of first-degree murder on an accomplice liability theory.

Point I is denied.

## II.

In her second Point, Sander argues that the circuit court erred in failing to *sua sponte* instruct the jury on lesser-included offenses.  Because Sander's counsel explicitly informed the court that he was not requesting the submission of any lesser-included offense instructions, the circuit court did not err in failing to submit any such instructions.

At the time of Sander's offense, and at the time of her trial, § 556.046 provided:

> 2.  The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the person of the offense charged and convicting him of the included offense. . . .

> 3.  The court shall be obligated to instruct the jury with respect to a particular included offense only if there is a basis in the evidence for acquitting the person of the immediately higher included offense and there is a basis in the evidence for convicting the person of that particular included offense.

9

The Missouri Supreme Court has held that these statutes required a circuit court to submit a lesser-included offense instruction only where a party timely requests an instruction:

> Collectively, sections 556.046.2 and 556.046.3, RSMo Supp. 2002, obligate a trial court to instruct the jury on a "lesser included offense" when: (1) "a party timely requests the instruction," (2) "there is a basis in the evidence for acquitting the defendant of the charged offense," and (3) "there is a basis in the evidence for convicting the defendant of the lesser included offense for which the instruction is requested."

*State v. Sanders*, 522 S.W.3d 212, 216 (Mo. 2017) (quoting *State v. Jackson*, 433 S.W.3d 390, 396 (Mo. 2014)); *see also*, *e.g.*, *State v. Johnson*, 284 S.W.3d 561, 575-76 (Mo. 2009). Under this caselaw, "'[i]f a defendant does not specifically request a lesser included offense instruction, the defendant may not complain about the trial court's failure to give the instruction.'" *State v. Leonard*, 490 S.W.3d 730, 744 (Mo. App. W.D. 2016) (quoting *State v. Fowler*, 938 S.W.2d 894, 898 (Mo. 1997); footnote omitted). "'Part of the rationale for this rule is that failing to request a lesser-included offense instruction is often trial strategy . . . .'" *Id.* (citation omitted).

Under Article V, § 2 of the Missouri Constitution, the Missouri Supreme Court's "decisions shall be controlling in all other courts." Under Article V, § 2, we are required to follow the Missouri Supreme Court decisions holding that a circuit court does not err in failing to give a lesser-included offense instruction, unless such an instruction is requested. Because no such request was made here, Sander's second Point necessarily fails.

Sander points out that, in 2022, the General Assembly amended § 556.046.3 to add language specifying that a court is obligated to instruct on a

lesser-included offense "only if the instruction is requested." *See* § 556.046.3, RSMo Cum. Supp. 2023. Sander argues that we must presume that, in enacting this amendment, the legislature intended to change existing law. *See*, *e.g.*, *State v. Osborn*, 504 S.W.3d 865, 878 (Mo. App. W.D. 2016). Sander reasons that, because the General Assembly specified – *after 2022* – that a court was obliged to instruct on a lesser offense only if such an instruction was requested, no such requirement existed prior to that time.

Sander's argument does not allow us to ignore Supreme Court decisions which hold (under the <u>pre-2022</u> version of § 556.046) that a circuit court does not err in failing to give a lesser-included offense instruction where none is requested. While later statutory amendments <u>may</u> signal the General Assembly's desire to change the law, in amending a statute "the legislature's purpose 'may be to clarify and detail an existing law.'" *Mann v. McSwain*, 526 S.W.3d 287, 292 (Mo. App. W.D. 2017) (quoting *State v. Starkey*, 380 S.W.3d 636, 644 (Mo. App. E.D. 2012)); *see also, e.g., Webster Cnty. Abstract Co. v. Atkison*, 328 S.W.3d 434, 443 (Mo. App. S.D. 2010); *Anderson ex rel. Anderson v. Ken Kauffman & Sons Excavating, L.L.C.*, 248 S.W.3d 101, 109 (Mo. App. W.D. 2008) (*en banc*).

Thus, the legislature's 2022 amendment of § 556.046 may have simply been intended to ratify the request requirement recognized in prior caselaw, rather than to impose such a requirement for the first time. Accordingly, we cannot conclude that the 2022 amendment had the effect of overruling the multiple pre-2022 Supreme Court decisions which hold that a circuit court is not required to give a lesser-included offense instruction where no such instruction is requested.

Point II is denied.

### III.

In Point III, Sander argues that the trial court abused its discretion by permitting the State to elicit testimony from the manager of the convenience store that Sander "seemed happy" when she visited the store three to five days after the shooting.

> The standard of review for the admission of evidence is abuse of discretion. A trial court has broad discretion to admit or exclude evidence at trial. The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect. Abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Only if the error is so prejudicial that it deprived the defendant of a fair trial is reversal warranted. Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial.

*State v. Griest*, 670 S.W.3d 179, 188-89 (Mo. App. W.D. 2023) (citations and internal quotation marks omitted).

During her testimony at trial, the store manager said she had seen Sander on the day of the shooting (September 7, 2018), when Sander's demeanor was calm, and "maybe a little nervous at times." The State then asked:

[State]: And did you see Nancy Sander days after the murder?

[Manager]: I did.

[State]: And can you describe her demeanor?

[Manager]: She seemed happy.

Sander's counsel did not object to this testimony.

On redirect examination, the State again asked the store manager about Sander's demeanor several days after the shooting. Sander's counsel objected

12

that the question "[c]alls for speculation." The circuit court overruled the objection, and the store manager again testified that Sander "seemed happy."

Sander cannot establish reversible error based on the store manager's testimony on redirect examination, when the store manager had offered exactly the same testimony on direct examination without objection. "An objection to testimony must be made at the earliest possible opportunity to allow the trial court to invoke remedial remedies." *State v. Blurton*, 484 S.W.3d 758, 774 (Mo. 2016) (citation omitted). "[A]dmission of testimony over objection is not reversible error if similar questions have previously been asked and answered without objection." *Id.* at 775 (citations omitted); *accord, State v. Allen*, 597 S.W.3d 420, 431-32 (Mo. App. E.D. 2020). Even if the objection was properly preserved, Sander could not establish that she was prejudiced, since "'[a] complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence.'" *State v. Brandolese*, 601 S.W.3d 519, 536 (Mo. 2020) (citation omitted).

The circuit court did not abuse its discretion in admitting the store manager's testimony in any event. "A trial court has wide discretion in admitting the testimony of a lay witness into evidence." *State v. Presberry*, 128 S.W.3d 80, 86 (Mo. App. E.D. 2003) (citation and internal quotation marks omitted). A lay witness generally may not testify regarding their opinion on a matter in dispute, and instead must state facts from which the jury can form its own opinions. *State v. Starkey*, 380 S.W.3d 636, 647 (Mo. App. E.D. 2012). However, "a witness who personally observed events may testify to his matter of fact comprehension of what he has seen in a descriptive manner which is actually a conclusion, opinion

13

or inference, if the inference is common and accords with the ordinary experiences of everyday life." *State v. Davidson*, 242 S.W.3d 409, 414 (Mo. App. E.D. 2007) (citations and internal quotation marks omitted).

A lay witness may testify to their impressions concerning a defendant's mental or emotional state if those impressions are based on personal observation, do not address an ultimate issue, and are consistent with common experience. Thus, in *State v. Gray*, 731 S.W.2d 275 (Mo. App. W.D. 1987), we held that a witness could testify about an incident where he watched a television news report about a crime with the defendant, looked over at the defendant, "and knew by the look on his face what had happened." *Id.* at 284-85. We held that this was not impermissible opinion testimony, but rather a practical and convenient "'shorthand rendition' of a composite situation." *Id.* at 285. We noted that "[i]t may be necessary to allow such evidence in order not to risk its loss. For in such a case where it is extremely difficult or impossible for a witness to convey an accurate sense of the observed events if confined to a statement of facts [in the orthodox sense], the evidence would be simply lost to the jury." *Id.* (citation omitted); *see also, e.g.*, *State v. Strong*, 142 S.W.3d 702, 716 (Mo. 2004) (police officer could permissibly testify that the defendant "was 'nonchalant' after running from officers outside [victim's] apartment following her murder"); *State v. Langford*, 455 S.W.3d 73, 76-77 (Mo. App. S.D. 2014) (a cashier was properly permitted to testify that she believed the defendant was attempting to pay for items with counterfeit currency when he laid a fake bill on the store counter, since "her impression . . . [was] based on his demeanor and expression"); *State v. Shaffer*, 439 S.W.3d 796, 801 (Mo. App. W.D. 2014) (noting that witness could

14

permissibly "have testified that it appeared to her that [another individual] was upset"); *State v. Hill*, 812 S.W.2d 204, 208 (Mo. App. W.D. 1991) (trial court did not err by permitting officer to testify that the defendant "'was rather combative with me'").

In this case, the store manager's testimony that Sander "seemed happy" was a "short-hand rendition" of a composite impression. It may have been difficult for the store manager to parse out the individual observed features of Sander's appearance and behavior which led her to that impression. Individuals commonly form impressions of the emotional state of persons with whom they interact, based on a host of factors which may be difficult to individually identify and describe. Thus, individuals commonly form impressions that other people are happy, sad, angry, upset, excited, frustrated, nervous, etc. Given that the store manager personally observed Sander and made an everyday inference about her demeanor based on that observation, the circuit court did not abuse its discretion in permitting her testimony, even if it may have constituted an opinion rather than a direct observation.

Point III is denied.

## IV.

In Point IV, Sander contends that the circuit court erred "in overruling Defendant's objection to closing argument." Sander argues that the State improperly argued facts not in evidence when it claimed that Charles had spent the night before the murder at Sander's house, and that they had a conversation about killing the Victim during his stay.

> The standard of review for alleged error in closing argument depends upon whether defense counsel objects. . . . A defendant

15

> must object at the time an allegedly improper argument to the jury is made to preserve the error. Further, when the objection could be made during the trial, raising the issue for the first time in a motion for new trial is insufficient to preserve the alleged error.

*State v. Walter*, 479 S.W.3d 118, 122-23 (Mo. 2016) (citations omitted). When not properly objected to at trial, we may only review purportedly improper closing argument for plain error under Rule 30.20. *Id.*; *see also State v. Carter*, 415 S.W.3d 685, 691 (Mo. 2013); *State v. Tisius*, 362 S.W.3d 398, 409 (Mo. 2012).

Sander is entitled only to plain-error review of Point IV. Despite the claim in Sander's Point that the circuit court "overrul[ed] [her] objection to closing argument," the record reflects that the court *sustained* the only relevant objection Sander made, and that Sander failed to object to other similar statements made by the State in closing. In its closing, the State asserted numerous times – without objection – that Charles had spent the night before the murder at Sander's home, and that they planned Victim's murder together. The State reminded the jury that Charles' neighbor had testified that Charles called the neighbor on September 6, and told the neighbor that Charles was going to Sander's home. The State then argued – without objection – that Charles had stayed the night at Sander's home, and retrieved the gun from her home; it then asserted that, "if he didn't know [what he was going there for] on the drive up, he figured it out that night with [Sander] at her house." The State repeated its assertions that Charles had spent the night of September 6-7 at Sander's home several more times – all without objection. Sander's counsel only made one objection to the State's closing argument, when the State on rebuttal claimed that "[a] conversation was had that night" before the murder occurred. The court

16

sustained Sander's objection that the State's argument assumed facts not in evidence.

"'The threshold issue in plain error review is whether the circuit court's error was facially evident, obvious, and clear. If the appellant establishes a facially evident, obvious, and clear error, then this Court will consider whether the error resulted in a manifest injustice or miscarriage of justice.'" *State v. Teter*, 665 S.W.3d 306, 312 (Mo. 2023) (citation omitted). "A conviction will be reversed based on plain error in closing argument only when it is established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice." *State v. Edwards*, 116 S.W.3d 511, 536-37 (Mo. 2003). "In reviewing closing arguments, this Court examines the context of the argument made in light of the entire record." *Walter*, 479 S.W.3d at 124.

The circuit court did not commit evident, obvious, or clear error in permitting the State to argue that Charles had spent the night at Sander's residence before the murder, or to argue that Charles and Sander discussed the commission of the murder that night or the next morning. During closing argument, the State may argue the evidence and all reasonable inferences from the evidence. *State v. Brown*, 337 S.W.3d 12, 14 (Mo. 2011). "A prosecutor is entitled to substantial latitude in closing argument and may suggest reasonable inferences for the jury to draw from the evidence." *State v. Perkins*, 656 S.W.3d 285, 303 (Mo. App. E.D. 2022). However, "closing arguments must not go beyond the evidence presented; courts should exclude statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or

otherwise tend to confuse the jury." *State v. Deck*, 303 S.W.3d 527, 543 (Mo. 2010) (citations and internal quotation marks omitted).

The evidence reflected that Charles had told his neighbor that he was headed to Sander's house the night before the murder, that Sander drove Charles to the scene of the murder, that the murder took place early in the morning when Charles' own home was three hours away, and that Charles used a weapon belonging to Sander's daughter (another resident of Sander's home). From these facts, the inference that Charles stayed overnight in Sander's home was not unreasonable, and it was not plain error to permit the State to argue as much.

Additionally, as we have discussed in connection with Sander's sufficiency-of-the-evidence argument, the evidence was sufficient to permit the jury to infer that Sander assisted Charles in committing the Victim's murder. The video evidence can be interpreted as showing Sander conversing with Charles immediately before the murder; maneuvering the Victim so that he had his back to Charles as Charles approached; and moving away from the scene before the violent attack she knew was coming. Sander's behavior suggests that she and Charles had a common plan, and they plainly had the opportunity to discuss that plan from the moment Charles arrived at her home, until the Victim arrived at the convenience store the next morning. The suggestion that Charles and Sander had discussions which led to a plan for the Victim's murder was a reasonable inference supported by the evidence, and therefore permissible argument.

Sander has failed to demonstrate that the circuit court plainly erred by failing to intervene in the State's closing argument. Point IV is denied.

18

## V.

In Point V, Sander argues that the circuit court erred in overruling her objection that the State had failed to lay a proper foundation for admission of evidence concerning the internet searches conducted on her phone, because the authorship of those searches is unknown. Point V challenges the admission of State's Exhibit 79, which consists of a log of phone calls made on Sander's phone, and internet searches conducted, and websites visited, using the phone. Exhibit 79 was generated as the result of the extraction of data from Sander's phone.

"Before a document can be admitted into evidence, the proponent must lay the foundation for the document, including authenticity." *State v. Hosier*, 454 S.W.3d 883, 899 (Mo. 2015). "The authenticity of a document cannot be assumed, but what it purports to be must be established by proof." *State v. Swigert*, 852 S.W.2d 158, 163 (Mo. App. W.D. 1993). "[A]uthentication can be accomplished 'by circumstantial evidence.'" *State v. Hamm*, 675 S.W.3d 630, 641 (Mo. App. E.D. 2023) (quoting *Hosier*, 454 S.W.3d at 898-99). "The sufficiency of the circumstantial evidence to authenticate a document varies from case to case." *Id.* Once evidence is properly admitted, "it is still the province of the jury to determine its weight." *State v. Harris*, 358 S.W.3d 172, 175 (Mo. App. E.D. 2011).

In *Hamm*, the Eastern District recently held that the State had laid an adequate foundation for admission of cellular phone records acquired by the police from a service provider. In *Hamm*, an officer testified that he requested the records from the service provider in writing and during a phone conversation, and "received files in electronic format via an email from [the employee to whom he had spoken] later that night in response to his request." 675 S.W.3d at 640.

The records the officer received from the phone company included information concerning incoming and outgoing phone calls and text messages, and data indicating the phone's location at particular times. *Id.* The officer testified that the data offered as exhibits consisted of the same data he had received from the service provider, and that "he made no alterations, additions, or deletions to the files before downloading them onto the disk." *Id.*

The State laid an adequate foundation in this case for the admission of the internet search history from Sander's phone. The officer who extracted the data testified that Sander provided the phone to police and consented to a search of its contents; the officer also testified that the phone was returned to Sander after data was extracted from it. The officer testified that he used a specialized data extraction program called Cellebrite UFED PC, on which he had been trained. He testified that, using the program, he "cop[ied] everything that's on the phone onto our computer or onto a flash drive," without altering the data on the phone. The officer also testified that Exhibit 79 was an accurate copy of a "portion of the Cellebrite report from the extraction."

Sander does not contest that Exhibit 79 accurately depicted data which was on her cellular phone at the time the data extraction was conducted on September 7, 2018. Instead, she argues that the authenticity of the exhibit was not established, because the State failed to present evidence that _she_ had conducted the internet searches, and visited the websites, reflected in Exhibit 79. In making this argument, Sander relies on cases involving the admissibility of written communications, or text messages or social media posts. In those cases, courts have held that some evidence supporting an inference of the defendant's

authorship may be necessary before such communications are admitted into evidence. *See*, *e.g.*, *Hosier*, 454 S.W.3d at 899; *State v. Hein*, 553 S.W.3d 893, 897-98 (Mo. App. E.D. 2018); *State v. Francis*, 455 S.W.3d 56, 71-72 (Mo. App. E.D. 2014); *Harris*, 358 S.W.3d at 175-76; *see also*, *e.g.*, *State v. Wilson*, 602 S.W.3d 328, 333-34 (Mo. App. W.D. 2020); *State v. Snow*, 437 S.W.3d 396, 402-03 (Mo. App. S.D. 2014).

The cases Sander cites involve the admissibility of the content of particular communications allegedly authored by the defendant. This case is different. In this case, the State sought to introduce evidence that Sander's phone had been used to search for incriminating information on the internet, and to visit particular websites. Unlike text messages, which contain expressive content that may suggest a message was written by one or another person, internet searches, and internet browsing history, contain fewer distinguishing characteristics. The internet browser information at issue in this case is more closely akin to the call logs and location data at issue in *Hamm*, rather than the written notes or letters, text messages, or website postings at issue in the cases on which Sander relies.

In *Hamm*, and in other cases involving cellular phone usage or location data,[3] it has never been suggested that it was necessary for the State to establish that the defendant actually made particular calls, or that it was the defendant who had actually carried the phone to a particular location, in order to lay a foundation for the admissibility of the call logs or location data. Obviously, a defendant could argue that the call logs or location data were not probative of the defendant's guilt, based on the lack of evidence that the defendant was the one

---

[3] *See*, *e.g.*, *State v. Ellis*, 637 S.W.3d 338, 348-52 (Mo. App. W.D. 2021); *State v. McKay*, 459 S.W.3d 450, 456-57 (Mo. App. E.D. 2014).

who actually used or carried the phone at a particular time. But such issues go to *the weight* of the evidence, rather than its authenticity. Sander makes such an argument here. She notes that there was no evidence that her phone was password-protected, and she emphasizes that she resided with Kilgore – who had a well-documented desire to have the Victim murdered. Thus, the possibility exists that *Kilgore* conducted the incriminating internet searches and browsing, rather than Sander. While it was open for Sander to make this argument at trial, those issues were for the jury to consider in assessing Exhibit 79's probative value; they did not prevent the circuit court from exercising its discretion to admit Exhibit 79 into evidence.

In this case, evidence that the phone belonged to Sander, that it was in her possession at the time of the murder, and that the data from the phone was reliably extracted and accurately reported in State's Exhibit 79, was sufficient to lay a foundation for the admissibility of the exhibit.

Courts in other States have held, in similar circumstances, that an adequate foundation has been laid for the admission of an internet search or browsing history. Thus, in *Garcia v. State*, 300 So.3d 945 (Miss. 2020), the Mississippi Supreme Court upheld a trial court's decision to admit the internet search and browsing history extracted from a gaming device; in doing so, the Court rejected the defendant's reliance on caselaw involving messages posted on social media. The Court explained:

> Here, . . . we are not dealing with an electronic communication purporting to originate from Garcia's social-media account. We are dealing with electronic searches indisputably conducted on Garcia's electronic device. And when it comes to the authentication of internet searches, courts have found that evidence that searches

were conducted on the defendant's device is sufficient to make a prima facie case of authentication.

*Id.* at 973 ¶ 92 (citations omitted). The Court also emphasized that "the possibility that some of the searches on the Xbox could have been conducted by someone else besides Garcia goes to the *weight* of this evidence, not its authenticity." *Id.* at 973 ¶ 93 (footnote and citations omitted). Other decisions apply similar reasoning.[4]

In her briefing, Sander argues that, "[w]hile not part of the evidence one way or another, it is common knowledge that Google searches when tied to an account are migratory across all devices signed into the same account." This argument does not establish an abuse of discretion by the circuit court. As an initial matter, despite Sander's claim of "common knowledge," she did not argue to the circuit court that Exhibit 79 should be excluded because the internet searches may have been conducted on another device. Moreover, she presented no evidence to substantiate her contention that Exhibit 79 may reflect internet searches conducted on other devices using a common Google account. Finally, it

---

[4]    *See, e.g., Holzheuser v. State*, 828 S.E.2d 664, 668 (Ga. App. 2019) (rejecting challenge to authenticity of internet browsing history extracted from defendant's cellular phone; "To the extent that Holzheuser argues that the information on his phone could have been the product of a different person's use of his phone without his knowledge or permission, this argument goes to weight, not authenticity."; footnote omitted); *Hoey v. State*, 519 S.W.3d 745, 758 (Ark. App. 2017) (affirming trial court's ruling that internet search history from two cellular phones was admissible where the State presented evidence "that the phones belonged to Hoey and that the extraction reports were produced from Hoey's phones"); *McLemore v. State*, No. 02-15-00229-CR, 2016 WL 4395778, at *6 (Tex. App. Aug. 18, 2016) ("We cannot conclude, as appellant contends, that the evidence must 'definitely' show who accessed the data on the phone because the 'proponent of the proffered evidence need not eliminate all other possibilities inconsistent with authenticity.' The possibilities that someone accessed the data . . . are alternate scenarios that the jury was entitled to assess upon the admission of the evidence." (citations and internal quotation marks omitted)).

is unclear how Sander's argument, even if accurate, would serve to distance her from the incriminating internet searches. *Even if* the searches were conducted on another device and migrated onto her phone, the most obvious reason those searches would show up on <u>her</u> cellular phone would be that both her phone, and the other device, were signed in to <u>her</u> Google account. We fail to see how this additional argument serves to disassociate Sander from the internet searches, in a way which would defeat their authenticity.

Point V is denied.

## Conclusion

The circuit court's judgment is affirmed.

_____
Alok Ahuja, Judge

All concur.

24